*Maryland Department of the Environment, et al. v. Anacostia Riverkeeper, et al.*, No. 42, September Term, 2015, *Blue Water Baltimore, et al. v. Maryland Department of the Environment*, No. 43, September Term, 2015, *Blue Water Baltimore, et al. v. Maryland Department of the Environment, et al.*, No. 44, September Term, 2015, Opinion by Adkins, J.

**Environmental Law – Administrative Law – Clean Water Act – Permitting Process.** Maryland Department of the Environment's decision to issue several stormwater discharge permits to counties in Maryland is supported by substantial evidence, is not arbitrary and capricious, and is legally correct. Additionally, these permits satisfy federal monitoring requirements and do not violate public participation mandates.

Maryland Department of the Environment,
et al. v. Anacostia Riverkeeper, et al.
Circuit Court for Montgomery County
Case No.: 339466
Argued: November 5, 2015

Blue Water Baltimore et al. v. Maryland
Department of the Environment
Circuit Court for Anne Arundel County
Case No.: 02-C-14-186144
Argued: November 5, 2015

Blue Water Baltimore, et al. v. Maryland
Department of the Environment, et al.
Circuit Court for Baltimore City
Case No.: 24-C-14-000364
Argued: November 5, 2015

IN THE COURT OF APPEALS
OF MARYLAND

No. 42
September Term, 2015

MARYLAND DEPARTMENT OF THE
ENVIRONMENT, et al.

v.

ANACOSTIA RIVERKEEPER, et al.

No. 43
September Term, 2015

BLUE WATER BALTIMORE, et al.

v.

MARYLAND DEPARTMENT OF THE
ENVIRONMENT

No. 44
September Term, 2015

BLUE WATER BALTIMORE, et al.

v.

MARYLAND DEPARTMENT OF THE
ENVIRONMENT, et al.

Barbera, C.J.
Battaglia
Greene
Adkins
McDonald
Watts
Harrell, Glenn T., Jr. (Retired,
    Specially Assigned),
    JJ.

Opinion by Adkins, J.

Filed: March 11, 2016

## FACTS AND LEGAL PROCEEDINGS

Maryland Department of the Environment ("MDE") issued municipal separate storm sewer system ("MS4") discharge permits ("the Permits") to Anne Arundel County, Baltimore City, Baltimore County, Montgomery County, and Prince George's County ("the Counties"). Multiple organizations argue that the Permits do not comply with federal and state law, and they request that we remand for MDE to correct these legal errors.[1]

**Federal Framework: NPDES Permits and Municipal Stormwater Discharges**

Under the Clean Water Act ("CWA"), the discharge of pollutants is illegal. 33 U.S.C. § 1311. Through the National Pollution Discharge Elimination System ("NPDES"),[2] 33 U.S.C. § 1342, either the Environmental Protection Agency ("EPA") or an EPA-approved state, such as Maryland, may issue permits exempting a discharger from this prohibition. *See Piney Run Pres. Ass'n v. Cnty. Comm'rs of Carroll Cnty., Md.*, 268 F.3d 255, 265 (4th Cir. 2001). MDE is the authority in Maryland that administers the NPDES program. Code of Maryland Regulations ("COMAR") 26.08.04.07. An NPDES permit, however, does not give a discharger carte blanche. "Generally speaking, the NPDES requires dischargers to obtain

---

[1] We refer to the various environmental groups and individuals who challenge the Permits as the Water Groups. They include Anacostia Riverkeeper, Blue Water Baltimore, Inc., Chesapeake Bay Foundation, Inc., Earthjustice, Friends of the Earth, Gunpowder Riverkeeper, Inc., Magothy River Association, Inc., Mattawoman Watershed Society, Natural Resources Defense Council, Patuxent Riverkeeper, Inc., Potomac Riverkeeper Network, Sierra Club, Waterkeeper Alliance, Waterkeepers Chesapeake, West/Rhode Riverkeeper, Inc., Mac Thorton and Pat Munoz.

[2] Congress established the National Pollution Discharge Elimination System ("NPDES") pursuant to 1972 amendments to the Clean Water Act ("CWA"). *Natural Res. Def. Council, Inc. v. Costle*, 568 F.2d 1369, 1371 (D.C. Cir. 1977).

permits that place limits on the type and quantity of pollutants that can be released into the Nation's waters." *S. Fla. Water Mgmt. Dist. v. Miccosukee Tribe*, 541 U.S. 95, 102 (2004). These limits are called effluent limitations. *See* 33 U.S.C. § 1362(11) (defining an effluent limitation as "any restriction established by a State or the Administrator on quantities, rates, and concentrations of chemical, physical, biological, and other constituents which are discharged from point sources into navigable waters, the waters of the contiguous zone, or the ocean, including schedules of compliance"). The type of discharge determines the type of limitations the permit must impose on the discharger.

The Permits before us control stormwater pollutant discharge.[3] Stormwater consists of the rain and snowmelt that filters through the soil and courses over surfaces—collecting pollutants along the way—before passing through the municipal storm sewer systems[4] and into waterbodies. During the development of the Permits, the Water Groups explained the

---

[3] Notably, in 1973, the EPA exempted "separate storm sewers containing only storm runoff uncontaminated by any industrial or commercial activity" from the requirements of 33 U.S.C. § 1342. *Id.* at 1372. The United States Court of Appeals for the D.C. Circuit invalidated this regulatory action in *Natural Resources Defense Council, Inc. v. Costle*. *Id.* at 1377 ("[T]he EPA Administrator does not have authority to exempt categories of point sources from the permit requirements of [33 U.S.C. § 1342]."). It was not until 1987 that Congress acted to regulate municipal separate storm sewer systems ("MS4s"). *See Natural Res. Def. Council, Inc. v. EPA*, 966 F.2d 1292, 1296 (9th Cir. 1992) (explaining that Congress passed amendments to the CWA in 1987 in recognition of "the environmental threat posed by storm water runoff and EPA's problems in implementing regulations").

[4] MS4s are classified based on the population in the jurisdiction. 40 C.F.R. § 122.26 (b)(4), (7), (16). Because the Counties all have more than 250,000 people, the Permits are large MS4 permits. MDE, Montgomery County NPDES Permit Fact Sheet; MDE, Anne Arundel County NPDES Permit Fact Sheet; MDE, Baltimore County NPDES Permit Fact Sheet; MDE, Prince George's County NPDES Permit Fact Sheet; MDE, Baltimore City NPDES Permit Fact Sheet.

2

problems that stormwater poses, whether to the surface conditions of Maryland's waters, for humans who recreate and subsist on them, and for wildlife who live in them. *See* Letter with Comments on Draft MS4 Permit for Baltimore City from Blue Water Baltimore, Inc. and Earthjustice, to Brian Clevenger, MDE (Sept. 21, 2012). In recognition of extensive public commentary on the severity of the problems associated with stormwater, MDE stated: "[i]t becomes fairly easy for all organizations, individuals, and government agencies to agree that urban stormwater is a problem that must be addressed." MDE, Response to Formal Comments for Montgomery County NPDES Permit (2009).

Nevertheless, municipal stormwater discharge is "highly intermittent," "usually characterized by very high flows occurring over relatively short time intervals," and "depend[s] on the activities occurring on the lands." *See* National Pollutant Discharge Elimination System Permit Application Regulations for Storm Water Discharges, 55 Fed. Reg. 47,990, 48,038 (Nov. 16, 1990) (codified at 40 C.F.R. § 122.26). It is also difficult to discern the amount of pollutant that any one discharger contributes to a waterbody because municipalities have so many outfalls, or discharge points, leading into the waters. *See* MDE, Montgomery County NPDES Permit Fact Sheet (900 outfalls); MDE, Anne Arundel County NPDES Permit Fact Sheet (nearly 1,000 outfalls); MDE, Baltimore County NPDES Permit Fact Sheet (nearly 700 outfalls.); MDE, Prince George's County NPDES Permit Fact Sheet (more than 4,000 outfalls); MDE, Baltimore City NPDES

Permit Fact Sheet (around 350 outfalls.); *see also* 40 C.F.R. § 122.26(b)(5), (9) (outlining

minimum diameters of pipes in major MS4 outfalls).[5]

Because of the nature of municipal stormwater discharges, Congress adopted a

flexible approach to the control of pollutants in MS4s. *See* 55 Fed. Reg. at 48,038 (The

Congressional Record from 1986 stated not only that "an end-of-the-pipe treatment

technology is not appropriate for [the MS4] discharge" but also that "[MS4] controls may

be different in different permits.").[6] Pursuant to 33 U.S.C. § 1342(p)(3)(B)(iii), municipal

stormwater permits "shall require controls to reduce the discharge of pollutants to the

maximum extent practicable, including management practices, control techniques and

system, design and engineering methods . . . ."[7]

---

[5] A point source is "any discernible, confined and discrete conveyance . . . from which pollutants are or may be discharged." 33 U.S.C. § 1362(14). Although storm sewers are point sources, the urban runoff that leads to them had once been considered nonpoint source pollution. Mark Ryan, The Clean Water Act Handbook 167 (3d ed. 2011) ("Stormwater runoff in the early days of the NPDES program was treated as a diffuse source of nonpoint source pollution. This may have seemed logical because most runoff cannot efficiently be controlled using the strict end-of-pipe effluent limitations that are effective in regulating traditional industrial and municipal discharges."); *cf. Ecological Rights Found. v. Pac. Gas & Elec. Co.*, 713 F.3d 502, 508 (9th Cir. 2013) ("Stormwater runoff is 'a nonpoint or point source . . . depending on whether it is allowed to run off naturally (and is thus a nonpoint source) or is collected, channeled, and discharged through a system of ditches, culverts, channels, and similar conveyances (and is thus a point source discharge).'").

[6] Congress passed the Water Quality Act of 1987, thereby amending the CWA and revising the law for municipal stormwater discharge. *See* Water Quality Act, Pub. L. No. 100-4, 101 Stat. 7, 69 (1987) (codified at 33 U.S.C. § 1342(p)); *see also Natural Res. Def. Council, Inc.*, 966 F.2d at 1296, 1308.

[7] We shall sometimes refer to this provision with the acronym MEP.

Best management practices ("BMPs") have been a long-standing control or effluent limitation[8] in MS4 permits. *See* 40 C.F.R. § 122.44(k)(2) (BMPs "control or abate the discharge of pollutants when [a]uthorized under [33 U.S.C. § 1342(p)]"); *id.* § 122.44(k)(3) (BMPs are an appropriate control when "[n]umeric effluent limitations are infeasible"); *see also Tualatin Riverkeepers v. Or. Dep't of Envtl. Quality*, 230 P.3d 559, 564 (Or. Ct. App. 2010) ("'Best management practices,' such as those incorporated in the permits at issue in this case, are a type of effluent limitation."). The EPA defined BMPs to mean "schedules of activities, prohibitions of practices, maintenance procedures, and other management practices to prevent or reduce the pollution of 'waters of the United States.'" 40 C.F.R. § 122.2; *cf. Natural Res. Def. Council, Inc. v. EPA*, 808 F.3d 556, 579 (2d Cir. 2015) ("But EPA's narrative WQBEL [water-quality based effluent limitation] does not qualify as a BMP, as it is neither a practice nor a procedure."). Examples of the types of BMPs the Counties might implement pursuant to the Permits are infiltration practices and green roofs.[9]

---

[8] Although, as we explain, effluent limitations in MS4 permits are not required to meet water quality standards, we note that these limitations are often described as water quality based effluent limitations ("WQBELs"). *See* 33 U.S.C. § 1312.

[9] An infiltration practice "is characterized by a depression to form an infiltration basin where sediment is trapped and water infiltrates the soil." EPA, Chesapeake Bay Phase 5.3 Community Watershed Model § 6.7.5., at 6-51 (2010), *available at* http://www.chesapeakebay.net/about/programs/modeling/53/. "A green roof, or rooftop garden, is a vegetative layer grown on a rooftop." EPA, Using Green Roofs to Reduce Heat Islands (last updated Sept. 22, 2015), *available at* http://www.epa.gov/heat-islands/using-green-roofs-reduce-heat-islands.

Through guidance memos, the EPA has endorsed the use of BMPs in MS4s for decades but has increasingly recommended that, where feasible, such permits include numeric effluent limitations. Interim Permitting Approach for Water-Quality Based Effluent Limitations in Storm Water Permits, 61 Fed. Reg. 43,761 (1996); EPA, Memorandum on Establishing Total Maximum Daily Load (TMDL) Wasteload Allocations (WLAs) for Storm Water Sources and NPDES Permit Requirements Based on Those WLAs § 3 (2002) [hereinafter "2002 Memo"]; EPA, Memorandum on Revisions to the November 22, 2002 Memorandum 4–5 (2010) [hereinafter "2010 Memo"]; EPA, Memorandum on Revisions to the November 22, 2002 Memorandum at 4 n.5 (2014) [hereinafter "2014 Memo"]. (A "numeric" effluent limitation "refers to [a] limitation[] with a quantifiable or measurable parameter related to a pollutant (or pollutants).").

**Total Maximum Daily Loads ("TMDLs")**

The concept of total maximum daily load ("TMDL") looms large in this case.[10] We begin by setting forth its basic purpose, then unpacking its complex formation.

TMDLs inform. *See Am. Farm Bureau Fed'n v. EPA*, 792 F.3d 281, 291 (3d Cir. 2015) ("Our understanding of [TMDLs] as informational tools is supported by every case and piece of scholarship to consider them as well as the language of the Chesapeake Bay TMDL itself."); *see also* EPA, Chesapeake Bay TMDL § 1.41, at 1-15 (2010) ("TMDLs

---

[10] At the end of 2010, when the EPA issued the Chesapeake Bay TMDL ("Bay TMDL"), which we will discuss, the EPA explained that there were more than 40,000 completed TMDLs in the United States. EPA, Chesapeake Bay TMDL Executive Summary, ES-3 (2010) [hereinafter "Bay TMDL ES"], *available at* http://www.epa.gov/chesapeake-bay-tmdl/chesapeake-bay-tmdl-document.

6

are 'primarily informational tools' that 'serve as a link in an implementation chain . . . .'"),

*available at* http://www.epa.gov/chesapeake-bay-tmdl/chesapeake-bay-tmdl-document.

TMDLs arise out of a multi-step process that begins with the establishment of water quality standards ("WQS"). *See Am. Farm Bureau Fed'n*, 792 F.3d at 289 ("TMDLs happen after a state enacts pursuant to its law (but required by the Clean Water Act) 'water quality standards.'"). Because the EPA and the states interact throughout this process, it has been described as one of "cooperative federalism." *Id.* at 288; *see Anacostia Riverkeeper, Inc. v. Jackson*, 798 F. Supp. 2d 210, 214–17 (D.D.C. 2011).

Water quality standards, as the term itself suggests, protect water quality. 40 C.F.R. § 130.2(d); COMAR 26.08.02.01(A). Each state must set water quality standards by assigning a "use" to a water, such as recreation or fishing, then developing criteria to protect those uses, as well as ensuring that higher quality waters do not degrade to the minimally accepted standard (also known as an anti-degradation policy). 33 U.S.C. § 1313; COMAR 26.08.02.01(B)(1). All water quality standards are subject to EPA review, and if the EPA does not approve of them, the EPA will set those standards itself. 33 U.S.C. § 1313.

By way of example, the EPA approved a TMDL that MDE submitted for fecal bacteria for the Non-tidal Cabin John Creek Basin in Montgomery County in 2007. *See* MDE, Total Maximum Daily Loads of Fecal Bacteria for the Non-tidal Cabin John Creek Basin in Montgomery County, Maryland (Document version: Oct. 13, 2006) [hereinafter "John Creek Basin TMDL"]. These bacteria are microscopic organisms in animal waste. Fecal bacteria in water can raise the risk of illness in humans who recreate there. *Id.* at

§ 1.0, at 1. To develop the WQS, MDE selected "water contact recreation and protection of aquatic life and public water supply" as the use of the water and 126 MPN[11] per 100 milliliters as the criteria. *Id.* at § 2.3, at 11 (citing COMAR 26.08.02.08O and 26.08.02.03-3). This figure (126) represents a mean density for this pollutant. *Id.*; *see* 40 C.F.R. § 130.2(i) ("[M]ass per time, toxicity, or [an]other appropriate measure" may be used to express TMDLs.).

After setting WQSs, the states establish effluent limitations in permits as the primary way to meet the WQSs because, as we have explained, effluent limitations restrict the discharge of pollutants. *See* 33 U.S.C. § 1362(11). Nevertheless, we note, importantly, that *MS4s are not subject to* the requirement of imposing effluent limitations "necessary to meet water quality standards." *See* 33 U.S.C. § 1311(b)(1)(C); *see also Defenders of Wildlife v. Browner*, 191 F.3d 1159, 1165 (9th Cir. 1999); *cf.* 33 U.S.C. § 1342(p)(3)(A) (Industrial dischargers must comply with 33 U.S.C. § 1311.).[12] This important point notwithstanding, Congress requires that "[e]ach State shall identify those waters within its boundaries for which the effluent limitations required by [33 U.S.C. § 1311] are not stringent enough to implement any water quality standard applicable to such waters." 33 U.S.C. § 1313(d)(1)(A).

---

[11] MPN refers to Most Probable Number. Code of Maryland Regulations ("COMAR") 26.08.02.03-3C.

[12] The Water Groups do not challenge the Court of Special Appeals' holding that the Montgomery County Permit "is *not* subject to the technology-based discharge limitations ("TBDLs") of § 1311(a), but rather to § 1342(p)(3)(B) . . . ." *Md. Dep't of the Env't v. Anacostia Riverkeeper*, 222 Md. App. 153, 172, 112 A.3d 979, 990 (2015) (emphasis in original), *cert. granted*, 443 Md. 734, 118 A.3d 861.

8

This is where the TMDL comes into play. The TMDL tells a state what is the threshold amount of a pollutant that a body of water can tolerate before violating the WQS. *See In re City of Moscow, Idaho*, 10 E.A.D. 135, 2001 WL 988721, at \*4 (EAB July 27, 2001) ("A TMDL is a measure of the total amount of a pollutant from point sources, nonpoint sources and natural background, that a water quality limited segment can tolerate without violating the applicable water quality standards."); EPA, Chesapeake Bay TMDL § 1.1, at 1-2 ("A TMDL specifies the maximum amount of a pollutant that a waterbody can receive and still meet applicable WQS.").[13]

States must establish TMDLs "at a level necessary to implement the applicable water quality standards," 33 U.S.C. § 1313(d)(1)(C), when they identify those waters for which effluent limitations cannot implement the WQSs, 33 U.S.C. § 1313(d)(1)(A).[14] As with water quality standards, the states have the obligation of setting TMDLs and submitting them to the EPA for approval. *See supra* MDE, John Creek Basin TMDL (The EPA approved of MDE's TMDL in March 2007.). If the EPA disapproves of the TMDLs, the EPA will set them itself. 33 U.S.C. § 1313(d)(2).

---

[13] The EPA has defined the TMDL as "[t]he sum of the *individual WLAs for point sources* and LAs for nonpoint sources and natural background." 40 C.F.R. § 130.2(i) (emphasis added). In this case, we focus on wasteload allocations ("WLAs"), which we will soon discuss. The other major component of the TMDL equation—load allocations ("LAs")—deals with nonpoint sources of pollution, 40 C.F.R. § 130.2(g), and is irrelevant to this case because we are concerned with the discharge of pollutants from point sources. *See Natural Res. Defense Council*, 966 F.2d at 1295–96 & n.5 (discussing the legislative and regulatory history leading up to the regulation of stormwater as a point source).

[14] To be clear, Maryland, as all other states, must comply with 33 U.S.C. § 1313(d) and establish TMDLs even though MS4s are not subject to effluent limitations "necessary to meet water quality standards." *See* 33 U.S.C. § 1311(b)(1)(C).

For this case, wasteload allocations ("WLAs") are the most critical part of the TMDL equation. *See* 40 C.F.R. § 130.2(i) (A TMDL is "[t]he sum of the individual WLAs for point sources and LAs [load allocations] for nonpoint sources and natural background."). The WLA represents a water's "loading capacity" assigned to its "point sources of pollution." *Id.* § 130.2(h). Continuing with our example, MDE set the TMDL for fecal bacteria at 176.36 billion MPN/day, the LA at 68.17 billion MPN/day, and the WLA at 108.19 billion MPN/day. MDE, John Creek Basin TMDL.[15]

Although TMDLs are informational tools, of which WLAs are a part, WLAs are more akin to restrictions. *See Am. Farm Bureau Fed'n v. EPA*, 984 F. Supp. 2d 289, 328 (M.D. Pa. 2013) ("WLAs are not permit limits *per se*; rather they still require translation into permit limits . . . .") (citation omitted) (internal quotation marks omitted) (emphasis in original), *aff'd*, 792 F.3d 281 (3d Cir. 2015). Under 40 C.F.R. § 122.44(d)(1)(vii)(B),

---

[15] MDE documented WLAs for two sources of fecal bacteria for the Cabin John Creek TMDL—domestic pets and wildlife—but the final WLA represents "one combined load for the entire land area of the county." MDE, Total Maximum Daily Loads of Fecal Bacteria for the Non-tidal Cabin John Creek Basin in Montgomery County, Maryland § 4.8, at 32 (Document version: Oct. 13, 2006) [hereinafter "John Creek Basin TMDL"]. MDE was acting according to the EPA's 2002 guidance memo: "available data and information usually are not detailed enough to determine WLAs for NPDES-regulated stormwater discharges on an outfall-specific basis." *See* EPA, Memorandum on Establishing Total Maximum Daily Load (TMDL) Wasteload Allocations (WLAs) for Storm Water Sources and NPDES Permit Requirements Based on Those WLAs 4 (2002) [hereinafter "2002 Memo"]. Since then, the EPA continues to express that it "does not expect states to assign WLAs to individual MS4 outfalls." EPA, Memorandum on Revisions to the November 22, 2002 Memorandum at 7 (2014) [hereinafter "2014 Memo"].

permitting authorities must ensure that effluent limitations "are consistent with the assumptions and requirements" of any approved WLA.[16]

We conclude our introduction of TMDLs by noting that MS4s are subject to the MEP standard under 33 U.S.C. § 1342. MS4s are not, however, required to impose effluent limitations necessary to meet water quality standards. The CWA still requires Maryland to set water quality standards and TMDLs—subject to the EPA's approval. Flowing from this obligation is the requirement that MS4s are subject to effluent limitations that are consistent with WLAs of EPA-approved TMDLs.

### The Chesapeake Bay TMDL

As we will discuss in more detail, the Permits require the Counties to take actions to make progress in meeting the WLAs of many EPA-approved TMDLs.[17] By far, though, the most critical TMDL in this case is the Chesapeake Bay TMDL ("Bay TMDL").

Regarded as a national treasure,[18] the Chesapeake Bay is the largest estuary in the United States, a product of flooding from the Susquehanna River over thousands of years.

---

[16] Thus, MDE has incorporated this requirement into the Permits at Part IV.E.

[17] *See* Part IV.E.4. The Fact Sheet for Montgomery County's Permit shows that, less than two years before that Permit became effective, the EPA had approved seven TMDLs (and consequently seven WLAs), that five TMDLs were pending the EPA's approval or soon to be subject to the EPA's review, and that MDE would later address 21 TMDLs. At the time the other Permits were issued, the EPA had approved 34 WLAs for Anne Arundel County, 33 WLAs for Baltimore County, 63 WLAs for Prince George's County, and 18 WLAs for Baltimore City.

[18] On May 12, 2009, President Barack Obama issued Executive Order 13508, Chesapeake Bay Protection and Restoration, and called the Chesapeake Bay a "national treasure." The White House Office of the Press Secretary, Executive Order 13508— Chesapeake Bay Protection and Restoration (May 12, 2009), *available at*

11

Alice Jane Lippson, The Chesapeake Bay in Maryland: An Atlas of Natural Resources 2 (Johns Hopkins University Press 1973). Over 2,000 species of animals and plants reside in the Chesapeake Bay. Alice Jane Lippson & Robert L. Lippson, Life in the Chesapeake Bay viii (Johns Hopkins University Press 1984). These include phytoplankton, the blue crab, and striped bass, among many, many others. Lippson, The Chesapeake Bay in Maryland, *supra* at 14, 26, 36. In addition to housing much wildlife, the Chesapeake Bay is a shipping and commerce hub and a source of recreation. Chesapeake Bay Program, Chesapeake Bay: Introduction to an Ecosystem 2 (2004).

Human activity, however, threatens this complex ecosystem. "Excess sediment and nutrients endanger the Bay's water quality." *Id.* at 3–4. Such threats include: depriving species of oxygen; delivering chemicals which collect in animal tissue; and even destroying habitats because sunlight cannot reach critical underwater grasses where species reside. *Id.*

There is, then, no underestimating the importance of the restoration of the Chesapeake Bay in Maryland. *See Am. Farm Bureau*, 984 F. Supp. 2d at 298 ("[The Bay] has been described as one of the most biologically productive ecosystems in the world," and, along with its watersheds, "add[s] ecological, economic, recreational, historic, and cultural value to the region.").

How to restore the Bay, however, has been a prolonged, frustrated process. *See id.* (The Bay TMDL "is not a new or recent idea," and thus, "it would be improper to view the Final TMDL in a vacuum as a single, isolated effort to restore water quality to the

---

https://www.whitehouse.gov/the-press-office/executive-order-chesapeake-bay-protection-and-restoration.

Chesapeake Bay."). Some of these restoration efforts include the Chesapeake Bay Agreement in 1980, another agreement in 1987, amendments to the agreement in 1992, and the Chesapeake 2000 Agreement. Department of Legislative Services, Office of Policy Analysis, Chesapeake Bay Restoration and the Tributary Strategy: An Analysis of Maryland's Efforts to Meet the Nutrient and Sediment Reduction Goals of the *Chesapeake 2000* Agreement 3–4 (2007).

The EPA established the Bay TMDL in December 2010. *See Am. Farm Bureau Fed'n*, 792 F.3d at 290 ("As noted, for the Chesapeake Bay the relevant states and the EPA agreed that the EPA would draft the TMDL in the first instance."). It has survived legal challenges before the U.S. District Court for the Middle District of Pennsylvania as well as the Third Circuit.[19] *See Am. Farm Bureau Fed'n*, 984 F. Supp. 2d at 294; *Am. Farm Bureau Fed'n*, 792 F.3d at 287. These courts have noted that the efforts to restore the Chesapeake Bay extend back decades, and that the development of the Bay TMDL itself has been a decade-long process. *Am. Farm Bureau Fed'n*, 984 F. Supp. 2d at 299; *Am. Farm Bureau Fed'n*, 792 F.3d at 291.

---

[19] On February 29, 2016, the United States Supreme Court denied American Farm Bureau Federation's Petition for Writ of Certiorari for review of the Third Circuit's decision to uphold the EPA's exercise of its authority in developing the Bay TMDL. *See* Supreme Court of the United States (March 10, 2016), *available at* http://www.supremecourt.gov/Search.aspx?FileName=/docketfiles/15-599.htm.

The Bay TMDL provides information pertaining to pollution reduction for nitrogen, phosphorus and sediment in the Chesapeake Bay and applies to the District of Columbia and the six "Bay" states, including Maryland.  EPA, Chesapeake Bay TMDL at ES-1.[20]

## Modeling

Before delving into Maryland's role in the formation of the Bay TMDL, we must discuss the "critical and valuable" role that modeling played in the Bay TMDL's development.  EPA, Chesapeake Bay TMDL at ES-5.[21]  "Modeling is an approach that uses observed and simulated data to replicate what is occurring in the environment to make future predictions."  *Id.*  "A model 'is an abstraction from and simplification of the real world.'"  *Am. Farm Bureau*, 984 F. Supp. 2d at 340 (citation omitted).  Models are essential when one seeks to study "ecosystems that are too large or complex for real-world monitoring," such as the Chesapeake Bay and its watersheds.  Chesapeake Bay Program, About the Bay Program: Modeling, *available at* http://www.chesapeakebay.net/ about/programs/modeling (last visited Feb. 9, 2016) [hereinafter CBP: Modeling].

---

[20] A multi-year congressional study revealed in 1983 that nitrogen and phosphorus were major sources contributing to the Bay's degradation.  Ben Franklin, *Chesapeake Bay Study Citing Pollution Threats*, N.Y. Times (Sept. 27, 1983) ("The reports said the steady inflow of nitrogen and phosphorus . . . had caused large, offensive, blue-green 'blooms' of algae on the bay's surface.  The algae growth consumes oxygen in the water and reduces the penetration of sunlight, killing aquatic life in large areas of the bay.").  Former Maryland Senator Charles Mathias was a chief supporter of this study.  *Id.*

[21] To be clear, the EPA did not rely exclusively on modeling to develop this TMDL but also used monitoring and environmental research.  EPA, Chesapeake Bay TMDL, at 5-19.

14

A prominent component in the modeling of the Bay TMDL was the Phase 5.3 Chesapeake Bay Watershed Model ["Phase 5.3 Model"]. EPA, Chesapeake Bay TMDL, at 5-19.[22] "The Phase 5.3 Model is the most recent of a series of increasingly refined versions of the Chesapeake Bay Watershed Model." EPA, Chesapeake Bay Phase 5.3 Community Watershed Model § 1.2.1, at 1-13 (2010), *available at* http://www.chesapeakebay.net/about/programs/modeling/53/.[23] The Phase 5.3 Model simulates the "loading and transport of nitrogen, phosphorus, and sediment from pollutant sources throughout the Bay watershed." EPA, Chesapeake Bay TMDL, at 5-20. Additionally, this model provides "estimates of watershed nitrogen, phosphorus, and sediment loads resulting from various management scenarios." *Id.*

Because models are not "perfect forecasts," however, modeling is "part of a broader toolkit," including monitoring, "to gain the highest possible level of accuracy." CBP: Modeling. As the EPA explained: "The Bay modeling framework takes advantage of decades of atmospheric deposition, streamflow, precipitation, water quality, biological resource, and land cover monitoring data" as well as "tracking and reporting of the

---

[22] The EPA has explained that "[t]he primary reason, and benefit, for applying a watershed model for TMDL development typically is the ability to predict pollutant generation from varying land uses and from multiple subwatersheds." EPA, Handbook for Developing Watershed TMDLs: Draft 58 (2008). As opposed to single-segment TMDLs, watershed TMDLs involve the "simultaneous development of multiple TMDLs for hydrologically linked impaired segments." *Id.* at 3.

[23] The District Court for the Middle District of Pennsylvania rejected American Farm Bureau Federation's challenge to the Phase 5.3 Model "as being insufficient for allocations established at the sub-watershed level." *Am. Farm Bureau Fed'n*, 984 F. Supp. 2d at 341–42. The American Farm Bureau Federation did not appeal this issue to the Third Circuit. *Am. Farm Bureau Fed'n*, 792 F.3d at 294.

implementation of pollution load reduction best management practices." EPA, Chesapeake Bay TMDL, at § 5.1, 5-1–5-2. These resources allowed the EPA to calibrate its models. *Id.*

Because the Bay TMDL exists in significant part as a result of modeling, and because of how prevalent modeling is in TMDL formulation, MDE incorporated modeling into the Permits.

MDE incorporated by reference a document the agency published, called Accounting for Stormwater Wasteload Allocations and Impervious Acres Treated, Guidance for National Pollutant Discharge Elimination System Stormwater Permits ("the Guidance").[24] As the name suggests, the document serves dual purposes: the Counties can assess progress in achieving WLAs and also assess restoration of impervious surface areas through a credits-to-acres approach.[25] In the Guidance, MDE sets forth acceptable models that the Counties can use, including, Maryland's Assessment and Scenario Tool ("MAST").[26] MDE, Guidance at 2. The Guidance includes the pollutant rates for the Bay TMDLs—Total Nitrogen ("TN"), Total Phosphorus ("TP"), and Total Suspended Sediment ("TSS")—and requires that the Counties use these pollutant rates together with land use data to calculate baseline stormwater loads. *Id.* at 2–3. As the document explains,

---

[24] Although MDE did not incorporate the Guidance into the Montgomery County Permit, we set forth in our discussion why the Guidance is nevertheless available to the County in carrying out Permit requirements. *See infra* Discussion at pp. 42, 54 n.60.

[25] We discuss the credits-to-acres approach in depth in the Discussion.

[26] This model is accessible at www.mastonline.org.

16

"[t]hese pollutant loads are specific to the [] Bay TMDL." *Id.* at 2.  But the Counties may use the principles and methods in the Guidance "for any EPA approved TMDL." *Id.* at 1.

**Maryland's Watershed Implementation Plan ("WIP")**

The EPA developed the Bay TMDL to ensure that the Bay jurisdictions would put in place "all pollution control measures needed to fully restore the Bay and its tidal rivers" by 2025.  EPA, Chesapeake Bay TMDL at ES-1.  The EPA approved the Bay TMDL "only after" determining that each jurisdiction provided "reasonable assurance" that it would meet established pollutant reductions.  *Am. Farm Bureau Fed'n*, 792 F.3d at 291.  The Bay jurisdictions set forth their strategies for meeting pollutant reductions in Watershed Implementation Plans ("WIPs").  *Id.*

WIPs are "roadmaps" setting forth a plan for how and when a jurisdiction will reach the pollution reduction goals in the Bay TMDL.  EPA, Chesapeake Bay TMDL, at ES-8. The EPA described these roadmaps as the "cornerstone" that ensured the States were accountable in achieving pollution reductions.  *Id.*  Notably, the EPA expressed no concerns about Maryland's Final WIP,[27] whereas the EPA had to implement backstop allocations and adjustments in other Bay jurisdictions so that the EPA had reasonable assurance that all jurisdictions would achieve necessary reductions.  *See* EPA, Chesapeake

---

[27] The EPA highlighted Maryland's pursuit of legislation to fund urban stormwater management programs as a specific improvement between the draft and final versions of Maryland's Watershed Implementation Plan ("WIP").  EPA, Bay TMDL ES-10; *see* H.B. 987, 2012 Gen. Assemb. Reg. Sess. (Md. 2012); *see also* Maryland Code (1982, 2007 Repl. Vol.), § 4-202.1(a)(1) of the Environment Article ("EN").

17

Bay TMDL Executive Summary, ES-10–ES-13 (Dec. 29, 2010) [hereinafter "Bay TMDL ES"].[28]

Maryland's WIP lists restoration of "twenty percent of the counties' impervious surface area that is not already restored to the maximum extent practicable (MEP)" in the "key elements" supporting the reasonable assurance of the implementation of the WIP. Phase I WIP at 5-30. The elements also include the adaptive management approach whereby additional or alternative practices are implemented if existing programs are not meeting target reductions. *Id.*[29]

**Maryland's Stormwater Management History**

In addition to an explication of the federal permitting system, NPDES, and the complex components arising out of it, such as TMDLs, we also set forth Maryland's stormwater management program, which has evolved since its inception in the 1980s, and which is informative for purposes of analyzing the Permits.

In 1982, the General Assembly enacted laws "to reduce as nearly as possible the adverse effects of stormwater runoff." Maryland Code (1982, 2007 Repl. Vol.), § 4-201

---

[28] For example, in Pennsylvania, the EPA transferred half of the stormwater load not subject to permit restriction to the wasteload allocation (and thus bringing the load within the scope of a permit's restrictions) to increase the reasonable assurance the state would achieve pollutant allocations for urban stormwater discharge. EPA, Bay TMDL ES-11.

[29] Maryland allocated pollutant loads by sector. Thus, although its strategy to reduce impervious surface area will help the State comply with the pollutant load requirements for stormwater, Maryland will nevertheless have to implement other strategies to target other sectors, such as agriculture, air, and wastewater. Department of Legislative Services, Office of Policy Analysis, Achieving the Chesapeake Bay Restoration Mandate in Maryland 3–4 (2012).

of the Environment Article ("EN"); *see* H.B. 1091, 1982 Gen. Assemb. Reg. Sess. (Md. 1982). As a result, each county and municipality in Maryland was required for the first time to "adopt ordinances necessary to implement a stormwater management program" by July 1, 1984. *See* EN § 4-202. Then authorized by the General Assembly, the Department of Natural Resources issued regulations setting forth minimum control requirements and design criteria for the counties and municipalities. *See* 10 Md. Reg. 881, 884–85 (May 13, 1983) (to be codified at COMAR 08.05.05).[30] The regulations fostered the "primary goal" of "maintain[ing] after development, as nearly as possible, the predevelopment runoff characteristics" of the land. *See* EN § 4-203(b)(1); *see also* EN § 4-204(a) (Development of land is prohibited without submitting a stormwater management plan and obtaining the municipality's or county's approval of the plan.)

Maryland entered a new phase of stormwater management in the early 2000s. Pursuant to EN § 4-203(b), MDE adopted regulations to "rectify the[] programmatic shortcomings" of then-existing regulations that had provided "sparse guidance" on "water quality enhancement." 27 Md. Reg. 1167, 1168 (June 16, 2000) (to be codified at COMAR 26.07.02). Amending the stormwater regulations, MDE intended to "provide water quality treatment of up to 90 percent of the average annual rainfall throughout the State, establish ground water recharge standards, and outline a channel erosion control strategy," as well as "promote environmentally friendly site design." *Id.* To fulfill this purpose, MDE incorporated by reference the 2000 Maryland Stormwater Design Manual ("the Manual").

---

[30] MDE subsequently assumed the Department of Natural Resources' position to issue such regulations in 1987. S.B. 671, 1987 Gen. Assemb. Reg. Sess. (Md. 1987).

19

*Id.* at 1167, 1169.[31]  MDE required the counties and municipalities to revise their ordinances to incorporate the Manual's policies and practices by July 1, 2001.  *Id.* at 1170.

The Manual "provide[d] designers a general overview on how to size, design, select and locate BMPs at a new development site to comply with State stormwater performance standards."  Center for Watershed Protection ("CWP") & MDE, Manual, § 1.3, at 1.16. There are 14 performance standards, including the water quality volume standard ("WQ$_v$"). *Id.* § 1.2, at 1.13.

Another stormwater management phase began when the General Assembly required MDE to mandate the use of environmental site design ("ESD") in 2007.  H.B. 786, Gen. Assemb. Reg. Sess. (Md. 2007).  ESD is best understood as those practices, such as "small-scale stormwater management practices, nonstructural techniques, and better site planning," that "mimic natural hydrologic runoff characteristics and minimize the impact of land development on water resources."  EN § 4-201.1(b); *see, e.g.*, note 9 (green roofs). MDE implemented regulations to this effect and explained that "[t]he goal of the regulations is to maintain after development as nearly as possible, the predevelopment runoff characteristics of the site being developed using ESD to the MEP."  35 Md. Reg. 2191 (Dec. 5, 2008) (to be codified at COMAR 26.17.02).

---

[31] The Center for Watershed Protection ("CWP") produced a draft of the Manual in 1997 for the Water Management Administration pursuant to an agreement between MDE and the Department of Natural Resources and a grant from the National Oceanic and Atmospheric Administration.  The Water Management Administration administers the stormwater program for MDE.  MDE, Water Management Permits (last visited Feb. 8, 2016)  http://www.mde.maryland.gov/programs/permits/watermanagementpermits/pages/permits/watermanagementpermits/index.aspx.

**The Permits**

MDE issued several series of MS4 permits to the Counties that preceded the Permits before us today. *See* MDE, NPDES MS4 Permit Montgomery County Fact Sheet (2008) (The first two permits were issued in 1996 and 2001.); MDE, Basis for Final Determination to Issue Prince George's County's NPDES MS4 Permit (2013) (The first three permits were issued in 1993, 1999, and 2004.); MDE, Basis for Final Determination to Issue Baltimore County's NPDES MS4 Permit (2013) (The first three permits were issued in 1994, 2000, and 2005.); MDE, Basis for Final Determination to Issue Anne Arundel County's NPDES MS4 Permit (2013) (The first three permits were issued in 1993, 1999, and 2004.); MDE, Basis for Final Determination to Issue Baltimore City's NPDES MS4 Permit (2013) (The first three permits were issued in 1993, 1999, and 2005.).[32]

At issue here are five-year term Permits MDE most recently issued: to Montgomery County in February 2010, to Baltimore County in December 2014, to Baltimore City in December 2013, to Prince George's County in January 2014, and to Anne Arundel County in February 2014.

The Water Groups challenge the Permits in several respects, namely, (1) the requirement to restore impervious surface area, (2) the requirement to submit plans for TMDLs, (3) the monitoring requirements, and (4) the public's ability to participate in the development of the Permits.

---

[32] We shall sometimes refer to this agency document in the record as the Basis for Final Determination.

21

Some of these provisions are new and therefore represent an increase in responsibility on the Counties to maintain and improve the quality of their waters. *See, e.g.*, MDE, Basis for Final Determination to Issue Anne Arundel County's NPDES MS4 Permit (2013) ("These meetings resulted in the addition of more stringent conditions to Anne Arundel County's stormwater permit, in large part due to a regional and growing focus on restoring Chesapeake Bay."); *id.* ("New requirements in the permit will include . . . developing restoration plans to meet stormwater WLAs for impaired waters."); MDE, NPDES Montgomery County Stormwater Permit Response to Formal Comments at 2 (2009) ("MDE believes that this current municipal stormwater permit will force Montgomery County to make major strides toward controlling urban runoff better than ever before. New conditions such as trash abatement jurisdiction-wide and requiring an additional 20% of the County's impervious area to be restored are major additions.");[33] MDE, Maryland's 2006 TMDL Implementation Guidance for Local Governments i (2006) ("Until recently, Maryland has focused primarily on TMDL development, which establishes limits on pollutant loads. Now the State is moving into the implementation phase . . . .").

---

[33] *Cf.* Montgomery County Department of Environmental Protection, Annual Report NPDES MS4 Permit Montgomery County, Maryland III-56 (2003) ("The Permit requires the County to track progress and evaluate effectiveness of implementing programs and projects to restore a drainage area 'equaling ten percent of Montgomery County's impervious area that has not been treated to the maximum extent practicable' (10% goal).").

Before discussing these Permit provisions, we note additional Permit requirements that illustrate the breadth of the Counties' obligations. The Counties must implement management programs "to control stormwater discharges to the maximum extent practicable." These programs include a stormwater management program ("SWMP") and an erosion and sediment control program in accordance with state law; an "illicit discharge detection and elimination" program; requirements to reduce trash; obligations on the Counties to reduce pollutants associated with maintenance activities and on municipal facilities to submit pollution prevention plans; as well as a requirement to engage in public outreach activities to reduce stormwater pollution.

The Permits also require the Counties to engage in thorough analyses of the water quality of their watersheds. Among other things, the watershed assessments oblige the Counties to identify and prioritize water quality improvement projects.

MDE has also ensured that the Counties cannot use lack of adequate funding as a defense for failure to comply with Permit terms. The Permits explain that "[l]ack of funding does not constitute a justification for noncompliance with the terms of this permit."[34] To this end, the General Assembly enacted EN § 4-202.1 in 2012, requiring the Counties "to adopt local laws or ordinances necessary to establish an annual stormwater remediation fee and a local watershed protection and restoration fund to provide financial assistance for the implementation of local stormwater management plans." H.B. 987, 2012 Gen. Assemb. Reg. Sess. (Md. 2012); *see also* EN § 4-202.1(a)(1) (This "section applies

---

[34] *See* Montgomery County Permit Part III.I.2 ("Adequate program funding to comply with all conditions of this permit shall be maintained.").

23

to a county or municipality that is subject to a [NPDES Phase I MS4 permit].").[35] MDE had investigated the costs of meeting the Bay TMDL and commissioned a study that revealed that "stormwater BMPs likely represent the largest costs to local governments in implementing the TMDL." H.B. 987, 2012 Gen. Assemb. Reg. Sess. (Md. 2012).

The Permits also contain annual reporting requirements for: (1) the components of the stormwater management programs, and (2) data pertinent to the assessment of progress in implementing the Permit requirements, such as impervious surfaces and pollutant load reductions. MDE will review the Counties' reports to assess "progress toward meeting WLAs developed under EPA approved TMDLs" and the effectiveness of the programs in "reducing the discharge of pollutants to the MEP to protect water quality." MDE will require BMP and program modifications if the Counties fail to comply with the Permit or show progress.

The Permits also contain provisions setting forth sanctions for the violation of Permit conditions, including civil and criminal penalties. *See, e.g.*, Montgomery County NPDES Permit Part VI.C ("Failure to comply with a permit provision constitutes a violation of the CWA and is grounds for enforcement action; permit termination, revocation, or modification; or denial of a permit renewal application.").

---

[35] The General Assembly amended EN § 4-202.1 in 2015 by repealing the mandate that the relevant counties collect a stormwater remediation fee and instead "*authoriz*[*ing*] such jurisdictions to do so." S.B. 863, 2015 Gen. Assemb. Reg. Sess. (Md. 2015) (emphasis in original).

**Circuit Court and Court of Special Appeals Opinions**

EN § 1-601 provides for judicial review of MDE's final determination to issue a permit.[36] The Water Groups[37] challenged the Permits in the various counties where MDE issued them.

The Circuit Court for Montgomery County remanded for MDE to revise the Permit in accordance with its opinion and order. In a reported opinion, the Court of Special Appeals affirmed. *Md. Dep't of the Env't v. Anacostia Riverkeeper*, 222 Md. App. 153, 157, 112 A.3d 979, 981 (2015), *cert. granted*, 443 Md. 734, 118 A.3d 861. MDE filed a petition for writ of certiorari, which we granted.

The Circuit Court for Baltimore County, the Circuit Court for Anne Arundel County, and the Circuit Court for Prince George's County affirmed MDE's decision to issue those Permits. The Water Groups filed notices of appeal to the Court of Special Appeals and, upon MDE's motion, the Court of Special Appeals consolidated these three cases. MDE then filed a petition for writ of certiorari to this Court with questions nearly identical to those MDE submitted in its petition for writ of certiorari with respect to the Montgomery County Permit.

---

[36] The statutory requirements for judicial review, which include standing, are not in dispute. *See* EN § 1-601. The Court of Special Appeals determined that Anacostia Riverkeeper and other environmental groups had standing to challenge the Montgomery County Permit in Case No. 42. We reach the same conclusion with respect to all parties in the four other challenges in the circuit courts.

[37] Although we refer to the Water Groups collectively, we recognize that different coalitions within the Water Groups challenged the Permits in each County rather than each environmental group participating in the challenge before the circuit court in each County.

25

Finally, the Circuit Court for Baltimore City also affirmed MDE's decision to issue the Baltimore City Permit. The Water Groups filed a notice of appeal, and the Mayor & City Council of Baltimore ("Baltimore City") filed a petition for writ of certiorari with a request that we consider this petition in conjunction with MDE's petitions. We granted the City's petition.

As the Water Groups state in their brief, "the underlying Permits are substantively identical" and "are affected by the same legal defects." We agree that the Permits are so substantively similar that we will analyze the agreed upon questions brought before the Court with respect to all the challenged Permits. We have slightly rephrased the questions:

1. Did the MS4 permits issued by MDE for the counties' municipal storm sewer system appropriately incorporate by reference publicly available materials and was the requirement for restoration of 20% of pre-2002 developed impervious surfaces specific, measurable, and enforceable?

2. Was MDE's final decision to issue the permits with a 20% restoration requirement based upon the State's Chesapeake Bay TMDL strategies, and a reporting requirement to establish strategies to address wasteload allocations, supported by substantial evidence?

3. Do the provisions of the MS4 permits that require that the public have an opportunity to review and comment on restoration plans intended to meet the wasteload allocations established for the permittees under applicable total maximum daily loads satisfy public participation requirements?

4. Do the provisions of the MS4 permits satisfy federal monitoring requirements?

We uphold MDE's decision to issue the Permits on all grounds. Thus, we reverse the judgment of the Court of Special Appeals, which did not uphold the Montgomery

26

County Permit, and we affirm the judgments of the circuit courts, which upheld the Permits in Anne Arundel County, Baltimore City, Baltimore County, and Prince George's County.

## STANDARD OF REVIEW

Before 2009, challenges to the issuance or denial of a discharge permit were subject to a contested case hearing. Md. Code (1984, 2014 Repl. Vol.), § 10-222 of the State Government Article ("SG"), which is part of Maryland's Administrative Procedure Act, delineates the grounds upon which a court can reverse an agency decision in a contested case. Specifically, SG § 10-222 provides that a court can reverse an agency decision in a contested case that "is unsupported by competent, material, and substantial evidence in light of the entire record as submitted" or that "is arbitrary or capricious."

In 2009, the General Assembly changed the procedures for challenging a discharge permit. EN § 1–601 now permits direct judicial review of agency permitting decisions without a contested case hearing. Although this statute does not set forth a standard of review, the substantial evidence and arbitrary and capricious standards apply where an "organic statute" authorizes judicial review without a contested case hearing and does not set forth a standard of review. *See Supervisor of Assessments of Carroll Cnty. v. Peter & John Radio Fellowship, Inc.*, 274 Md. 353, 355, 335 A.2d 93, 94 (1975) ("Our cases have held that where no scope of review is thus provided, decisions of an administrative body will not be disturbed on appeal unless they are not supported by substantial evidence or are arbitrary, capricious or unreasonable.") (citations omitted); *Med. Waste Assocs., Inc. v. Md. Waste Coal., Inc.*, 327 Md. 596, 621, 612 A.2d 241, 253 (1992) ("In an action for judicial review of an administrative decision granting a permit, however, the court determines not

27

only whether the agency's decision to issue the permit was in accordance with law, but also whether the particular administrative decision was arbitrary, capricious or unsupported by substantial evidence in light of the record as a whole."). Thus, even though all challenges going to the merits of the Permits in these consolidated cases originated in the Circuit Courts,[38] we will review MDE's decision to issue the Permits under the substantial evidence and arbitrary and capricious standards of review.

Applying the substantial evidence standard of review to a case where no contested case hearing took place may seem anomalous because there is no formal record that was presented before an administrative law judge. EN § 1-606, however, expressly details the documents that can be included in a record. EN § 1-606(c)(1)-(9).[39] For example,

---

[38] The Water Groups initiated a challenge to the Montgomery County Permit before the General Assembly amended the Environmental Article and thus, the dispute over this Permit was the subject of a contested case hearing. The administrative law judge ("ALJ") concluded that the Water Groups lacked standing to challenge the Permit, but this was appealed. The Court of Special Appeals eventually held that the Water Groups did in fact have standing and remanded for consideration of the underlying substantive issues. The General Assembly, however, changed the procedures for challenging a discharge permit during this time. As a result, it was the circuit court that first held a hearing on the merits of the issuance of the Montgomery County Permit. Thus, no issues involving the merits of this Permit were addressed in a contested case hearing.

[39] EN § 1-606(c) provides:

Any judicial review of a determination provided for in accordance with § 1-601 of this subtitle or § 5-204 or § 16-204 of this article shall be limited to a record compiled by the Department or Board, consisting of:

(1) Any permit or license application and any data submitted to the Department or Board in support of the application;
(2) Any draft permit or license issued by the Department or Board;
(3) Any notice of intent from the Department or Board to deny the application or to terminate the permit or license;

28

EN § 1-606 stipulates that any draft permit, comments submitted to MDE during the public comment period, transcripts of public hearings on the permit application, and responses to submitted comments constitute part of the administrative record. Thus, we are essentially reviewing the same record that we would have examined, excluding the administrative law judge's decision, had the merits of this case been subject to a contested case proceeding. Accordingly, our review of the issuance of the Permits fits within the substantial evidence standard of review contemplated by SG § 10-222.

In a review for substantial evidence, we ask "whether a reasoning mind reasonably could have reached the factual conclusion the agency reached." *Najafi v. Motor Vehicle Admin.*, 418 Md. 164, 173, 12 A.3d 1255, 1261 (2011). We should accord deference "'to the agency's fact-finding and drawing of inferences'" when the record supports them. *Id.* (citation omitted); *see Mayor & Aldermen of City of Annapolis v. Annapolis Waterfront Co.*, 284 Md. 383, 399, 396 A.2d 1080, 1089 (1979) ("The court may not substitute its judgment on the question whether the inference drawn is the right one or whether a

---

> (4) A statement or fact sheet explaining the basis for the determination by the Department or Board;
> (5) All documents referenced in the statement or fact sheet explaining the basis for the determination by the Department or Board;
> (6) All documents, except documents for which disclosure is precluded by law or that are subject to privilege, contained in the supporting file for any draft permit or license;
> (7) All comments submitted to the Department or Board during the public comment period, including comments made on the draft application;
> (8) Any tape or transcript of any public hearings held on the application; and
> (9) Any response to any comments submitted to the Department or Board.

different inference would be better supported. The test is reasonableness, not rightness.")

(citation and internal quotation marks omitted). Moreover, we shall review the agency's

decision "'in the light most favorable to it.'" *Najafi*, 418 Md. at 173, 12 A.3d at 1261.

Finally, we must accord an agency great deference regarding factual questions involving

scientific matters in its area of technical expertise. *Bd. of Physician Quality Assurance v.*

*Banks*, 354 Md. 59, 69, 729 A.2d 376, 381 (1999) ("[T]he expertise of the agency in its

own field should be respected.").

We have characterized the arbitrary and capricious standard of review as one that is

"extremely deferential." *Harvey v. Marshall*, 389 Md. 243, 299, 884 A.2d 1171, 1205

(2005). In reviewing the issuance of an NPDES permit, the U.S. Court of Appeals for the

Second Circuit quoted language derived from *Motor Vehicle Mfrs. Ass'n v. State Farm*

*Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)—the United States Supreme Court's leading

case on the arbitrary and capricious standard:

> To determine whether the agency's actions were "arbitrary and
> capricious," we consider whether the agency 'relied on factors
> which Congress has not intended it to consider, entirely failed
> to consider an important aspect of the problem, offered an
> explanation for its decision that runs counter to the evidence
> before the agency, or is so implausible that it could not be
> ascribed to a difference in view or the product of agency
> expertise.'

*Natural Res. Def. Council*, 808 F.3d at 569 (citations and quotation marks omitted). The

court also elaborated that "[w]e must be 'satisfied from the record that the agency . . .

examine[d] the relevant data and articulate[d] a satisfactory explanation for its action'" and

that it "afford[ed] the agency's decision greater deference regarding factual questions

30

involving scientific matters in its area of technical expertise." *Id.* (quoting *State Farm*, 463 U.S. at 43) (citations and internal quotation marks omitted). The Second Circuit's articulation of the arbitrary and capricious standard is in accord with Maryland's treatment of this standard as one that is highly deferential. *See Harvey*, 389 Md. at 299, 884 A.2d at 1205. We are therefore mindful of the Second Circuit's explanation of the principles underlying the arbitrary and capricious standard when applying that standard to this case.[40]

In addition, we will review an agency decision for an error of law. When our review concerns a legal question, we apply less deference to the agency's conclusions. *HNS Dev., LLC v. People's Counsel for Balt. Cnty.*, 425 Md. 436, 449, 42 A.3d 12, 20 (2012). We refuse to uphold an agency decision "premised solely upon an erroneous conclusion of law." *Id.* (citation omitted) (internal quotation marks omitted). Otherwise, we ordinarily should give "considerable weight" to an agency's "interpretation and application of the statute which [it] administers." *W.R. Grace & Co. v. Swedo*, 439 Md. 441, 453, 96 A.3d 210, 217 (2014); *John A. v. Bd. of Educ. for Howard Cnty.*, 400 Md. 363, 381–82, 929 A.2d 136, 147 (2007) ("In reviewing an agency's legal conclusions, it is a fundamental

---

[40] Case law from the U.S. Court of Appeals for the D.C. Circuit, the preeminent federal appellate court for review of administrative action, is also helpful in understanding the degree of deference accorded under the arbitrary and capricious standard. In *Weyerhaeuser Co. v. Costle*, the court noted that in light of the structure and aims of the Clean Water Act, "and the breadth of authority delegated by it to the EPA to identify highly sophisticated control technology in an area fraught with scientific uncertainty," its review of the agency's action "encounter[ed] significant limitations in the substantive aspect where the given statutory standards are 'arbitrary,' 'capricious,' or 'abuse of discretion.'" 590 F.2d 1011, 1025 (D.C. Cir. 1978). The court highlighted that "an expansive concept and exercise of the review power [by numerous courts] charged with that function could easily impede accomplishment of the [Clean Water] Act's ambitious pollution-ending aspiration as well as its goal of industry-by-industry uniformity." *Id.*

principle of administrative law that a reviewing court should not substitute its judgment for the expertise of those persons who constitute the administrative agency.”).

## DISCUSSION

### Part I: The 20% Restoration Requirement

The Permits require, by the end of the five-year term, that the Counties restore 20% of the impervious surface areas in their watersheds that have not been restored to the MEP. This requirement “uses percent impervious cover in a watershed as a surrogate TMDL target.” ENSR, Pilot TMDL Applications Using the Impervious Cover Method § 1.0, at 1-1 (2005). Like so much of this case, we must unpack the science before we analyze the parties’ arguments.

As we develop on land, science has shown us that we profoundly impact our waters. Consider, for example, when “[t]rees, meadow grasses, and agricultural crops that had intercepted and absorbed rainfall are removed . . . .” CWP & MDE, Manual, § 1.1, at 1.3. Problematically, “[c]leared and graded sites erode, are often severely compacted, and can no longer prevent rainfall from being rapidly converted into stormwater runoff.” *Id.* These kinds of sites are known as impervious surfaces, surfaces “that do[] not allow stormwater to infiltrate into the ground,” such as “rooftops, driveways, sidewalks, or pavement.” EN § 4-201.1(d). “Impervious surfaces accumulate pollutants deposited from the atmosphere,” pollutants which are “rapidly delivered to downstream waters” during storms. CWP & MDE, Manual, § 1.1.1, at 1.5. The purpose of the 20% restoration requirement, then, is to use stormwater management practices to restore the natural,

32

beneficial processes in our environment that we have changed by developing impervious surfaces.

In other words, the 20% restoration requirement is a surrogate because the requirement does not control pollution reduction directly. *See* ENSR, Pilot TMDL Applications Using the Impervious Cover Method § 1.0, at 1-1. Rather, it is through restoring impervious surfaces with management practices that the Counties will reduce pollution. *See, e.g.*, CWP & MDE, Manual, § 1.2, at 1.13 ("[Management practices] shall be designed to remove 80% of the average annual post development total suspended solids load (TSS) and 40% of the average annual post development total phosphorus load (TP).").

## A. Maximum Extent Practicable

The Water Groups argue that the 20% restoration requirement is too opaque to comply with 33 U.S.C. § 1342(p)(3)(B)(iii), the MEP standard. They so argue because, they contend, MDE "failed to provide a specific performance standard for restoration activities" or a "numeric limitation . . . for what pollution reductions must be accomplished by the permittees' twenty-percent restoration efforts." They also argue that MDE failed to explain what impervious surface is "not restored to the MEP."

We disagree because (1) the applicable law does not impose a specific performance standard on MS4s and (2) MDE did actually select a performance standard for the Counties to adhere to. 33 U.S.C. § 1342(p)(3)(B)(iii) states:

> Permits for discharges from municipal storm sewers shall require controls to reduce the discharge of pollutants to the maximum extent practicable, including management practices, control techniques and system, design and engineering

methods, and such other provisions as the Administrator or the
State determines appropriate for the control of such pollutants.

From the text, we discern that Congress established a broad requirement for MS4s. The list of required controls is not exclusive. *See* 55 Fed. Reg. at 48,038 ("[MS4] controls may be different in different permits."). And the purpose of the controls—reducing the discharge of pollutants—exists alongside the flexible, undefined standard "to the maximum extent practicable." *See City of Abilene v. EPA*, 325 F.3d 657, 659–60 (5th Cir. 2003); *Natural Res. Def. Council, Inc. v. N.Y. State Dep't of Envtl. Conservation*, 25 N.Y.3d 373, 406 (N.Y. 2015) (Rivera, J., dissenting in part) ("The CWA does not define the maximum extent practicable standard. However, it appears to provide broad authority to agencies to control stormwater pollution."); 55 Fed. Reg. at 48,038 ("In enacting section 405 of the WQA [Water Quality Act], Congress recognized that permit requirements for [MS4s] should be developed in a flexible manner to allow site-specific permit conditions to reflect the wide range of impacts that can be associated with these discharges.").

33 U.S.C. § 1342(p)(3)(B)(iii) imposes no minimum standard or requirement on MDE other than to establish controls for MS4s to reduce the discharge of pollutants. *See Natural Res. Def. Council, Inc. v. EPA*, 966 F.2d 1292, 1308 (9th Cir. 1992) ("Congress did not mandate [in § 1342(p)(3)(B)(iii)] a minimum standards approach or specify that EPA develop minimal performance requirements. . . . . Congress could have written a statute requiring stricter standards, and it did not."). Thus, we reject the Water Groups'

34

argument that MDE committed legal error by "fail[ing] to provide a specific performance standard for restoration activities."[41]

Moreover, MDE tethered restoration to the practices in the Manual, which MDE incorporates into the Permits by reference. *See* Part III.E ("These management programs are designed to control stormwater discharges to the maximum extent practicable . . . ."); Part III.E.1 ("At a minimum, the County shall . . . [i]mplement the stormwater management . . . practices found in the [Manual] . . . ."). The Manual explains that the list of acceptable stormwater management practices is tied to the $WQ_v$. "The Water Quality Volume (denoted as the $WQ_v$) is the storage needed to capture and treat the runoff from 90% of the average annual rainfall." CWP & MDE, Manual, § 2.1, at 2.2.[42] The Manual further explains that the "$WQ_v$ is directly related to the amount of impervious cover created at a

---

[41] A review of the EPA's guidance on MS4s shows that the restoration requirement does have a numeric limitation—20%, which denotes the minimum percentage of impervious surface with respect to which the Counties must implement stormwater management practices from the Manual in order to fulfill this Permit requirement. *See* EPA, 2014 Memo at 4 n.5. (A numeric effluent limitation has "a quantifiable or measurable parameter related to a pollutant . . . . Numeric WQBELs may include . . . limits on pollutant discharges by specifying parameters such as . . . percentage or amount of effective impervious cover . . . ."). In other words, the EPA's guidance shows that numeric limits need not be limits on pollution reduction to be acceptable. The limits can, alternatively, specify parameters such as percentage of impervious cover.

[42] By connecting restoration practices to the water quality volume ("$WQ_v$") standard, MDE acted in accordance with the EPA's then most recent guidance on the development of BMPs. *See* EPA, Revisions to the November 22, 2002 Memorandum "Establishing Total Maximum Daily Load (TMDL) Wasteload Allocations (WLAs) for Storm Water Sources and NPDES Permit Requirements Based on Those WLAs" 3 (Nov. 12, 2010) ("Where WQBELs in permits for stormwater discharges from MS4s . . . . are expressed in the form of BMPs, the permit should contain objective and measurable elements (e.g., schedule for BMP installation or level of BMP performance).") [hereinafter "2010 Memo"].

35

site." *Id.* In other words, MDE chose a standard that relates to the very problem the 20% restoration requirement serves to abate: the increase in stormwater runoff and the discharge of pollutants because of the increase in impervious surfaces. *See* CWP & MDE, Manual, § 1.1., at 1.4 ("As can be seen, the volume of stormwater runoff increases sharply with impervious cover."). Thus, the record reflects that MDE has established a performance standard, $WQ_v$, that defines as acceptable those practices the Counties may choose from to fulfill the 20% restoration requirement. *See id.* § 2.7 (Acceptable Urban BMP Options).

Moreover, our discussion of restoration is instructive as to why, despite the Water Groups' contention, the "impervious surface area that is not restored *to the MEP*" is sufficiently clear and measurable. (Emphasis added.) The area that is not restored to the MEP is the area without the restoration controls described in the Manual. Moreover, the Manual explains that impervious area refers to an area "that does not have vegetative or permeable cover." CWP & MDE, Manual, § 2.1, at 2.4. Put together, the "impervious surface area that is not restored to the MEP" refers to a defined type of area (impervious surface) lacking a type of stormwater management control (the BMPs in the Manual). By way of example, previous MS4 reports delineate these criteria so that MDE can evaluate whether Montgomery County (in this example) installed the required controls. *See* Montgomery County Department of Environmental Protection, Annual Report for 2006 NPDES MS4 Permit F2, at III-64; *see also* 33 U.S.C. § 1342(p)(3)(B)(iii) (MS4 permits "shall require controls" such as management practices.).

Because 33 U.S.C. § 1342(p)(3)(B)(iii) does not require a specific performance standard, and because the concepts of restoration and impervious surface "not restored

36

to the MEP" are sufficiently clear as to the controls that the Counties must install, the 20% restoration requirement in the Permits complies with the MEP standard. *See* 33 U.S.C. § 1342(p)(3)(B)(iii).

### B. Substantial Evidence and Arbitrary and Capricious

The Water Groups also argue that MDE has not explained why it selected 20% as the restoration goal or how this Permit provision will promote necessary pollution reduction. The Water Groups contend that MDE ineffectively justifies its choice based on the Bay TMDL because the Permits do not assure that the Counties will achieve the Bay TMDL's objectives or reductions. Even accepting a connection between the 20% restoration requirement and the Bay TMDL, the Water Groups argue that MDE still failed to take into account numerous other TMDLs related to the Counties' waters.

We disagree with the Water Groups' position because (1) the applicable law affords permitting authorities flexibility in establishing controls for MS4s and (2) MDE has justified its decision based on a well-developed and vetted strategy. *Natural Res. Def. Council*, 808 F.3d at 569 (citation and internal quotation marks omitted). ("We must be 'satisfied from the record that the agency . . . examine[d] the relevant data and articulate[d] a satisfactory explanation for its action.'").

Congress established a flexible framework in 33 U.S.C. § 1342(p)(3)(B)(iii). As the text states, MS4s shall require controls "and such other provisions as the Administrator or *the State determines appropriate* for the control of such pollutants." 33 U.S.C. § 1342(p)(3)(B)(iii) (emphasis added). MDE has determined that the 20% restoration requirement is a key strategy in restoring the Chesapeake Bay. *See* Part VI.A

(Chesapeake Bay Restoration by 2025.). The Permits in particular state that the Counties will carry out the 20% restoration requirement in order to comply with the Bay TMDL. *Id.*

A review of Maryland's Watershed Implementation Plan ("WIP") is instructive as to why the 20% restoration requirement will help to restore the Chesapeake Bay. MDE, Basis for Final Determination. As we have discussed, WIPs are "roadmaps" setting forth a plan for how and when a jurisdiction will reach the pollution reduction goals in the Bay TMDL. EPA, Bay TMDL ES at ES-8. The EPA developed the Bay TMDL "*in reliance on*" the WIPs that each affected jurisdiction submitted to the EPA. *Am. Farm Bureau Fed'n*, 792 F.3d at 291 (emphasis added). Moreover, the EPA approved the Bay TMDL "*only after*" determining that each jurisdiction provided "reasonable assurance" that it would meet the pollutant reductions in its WIP. *Id.* (emphasis added); *see* EPA, Bay TMDL ES at ES-8 (The WIPs are the "cornerstone" that ensures accountability to achieve pollution reductions).[43]

Importantly, the strategies in Maryland's WIP for urban stormwater include, among other things, the reduction of impervious surface area by 20% over a five-year period, just as the Permits do. *Compare* Maryland Phase I Watershed Implementation Plan: Executive Summary ES-15 (Dec. 3, 2010) [hereinafter Phase I WIP ES], *with* Part III.G.2. In fact, restoration of "twenty percent of the counties' impervious surface area that is not already restored to the maximum extent practicable (MEP)" is listed in the "key elements" that

---

[43] Notably, the EPA expressed no concerns about Maryland's WIP, whereas the EPA had to implement backstop allocations and adjustments in other Bay jurisdictions so that the EPA had reasonable assurance that all jurisdictions would achieve necessary reductions. *See* EPA, Bay TMDL ES at ES-10–13.

provide reasonable assurance of the implementation of Maryland's WIP. Maryland Phase I Watershed Implementation Plan: § 5.2.2, at 5-30 (Dec. 3, 2010).

MDE incorporated another important element from the WIP to bolster compliance with the 20% restoration requirement. The EPA explained that the WIPs were to include "mechanisms to track and report implementation activities" and "provide alternative approaches." EPA, Chesapeake Bay TMDL ES at ES-8–ES-9. Maryland's WIP thus includes what we refer to as the adaptive management approach, whereby additional or alternative practices are implemented if existing programs are not meeting target reductions. Phase I WIP at 5-30.[44] MDE incorporated this approach from the WIP into the Permits as part of the agency's review of the Counties' annual reports: "BMP and program modifications shall be made" if the Counties fail to comply with the Permits or fail to show progress in meeting WLAs of EPA-approved TMDLs.[45] We are satisfied from the record that MDE "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action." *Natural Res. Def. Council*, 808 F.3d at 569 (citations and internal quotation marks omitted). We conclude, then, that MDE's decision to include the 20% restoration

---

[44] We also sometimes refer to this as the "iterative" process, a phrase MDE uses to refer to the same sequence of events in the Permits.

[45] We will explore the relationship between TMDLs and WLAs in more detail in our discussion of the Water Groups' challenge to the TMDL planning requirement in the Permits.

requirement in the Permits was supported by substantial evidence and is not arbitrary and capricious.[46]

Although we recognize that MDE issued the Montgomery County Permit before Maryland's WIP and the Bay TMDL were prepared, the Bay TMDL was not an isolated event. *See Am. Farm Bureau*, 984 F. Supp. 2d at 298 (The Bay TMDL "is not a new or recent idea," and thus, "it would be improper to view the Final TMDL in a vacuum as a single, isolated effort to restore water quality to the Chesapeake Bay."). As we have discussed, an important prior effort to restore the Chesapeake Bay was the Chesapeake 2000 Agreement. To achieve the restoration goals of that agreement, the Governor of Maryland's Chesapeake Bay Cabinet prepared a draft of the State's plan. Department of Legislative Services, Office of Policy Analysis, Chesapeake Bay Restoration and the Tributary Strategy: An Analysis of Maryland's Efforts to Meet the Nutrient and Sediment Reduction Goals of the *Chesapeake 2000* Agreement iii (2007). The strategy for stormwater included restoration of impervious surface in Montgomery County, the first County to successfully implement this program. *Id.* at 13. The State conceived of this

---

[46] To the extent that the Water Groups seek to challenge the soundness of a past action, i.e., Maryland's WIP, this is not the proper forum for such a challenge. *See In re City of Moscow, Idaho*, 10 E.A.D. 135, 2001 WL 988721, at *17 (EAB July 27, 2001) ("[W]e find that this is not the appropriate forum for raising this issue [of a time period incorporated into a TMDL]. We agree with the Region (Ten of the EPA) that Petitioner's allegations are in essence challenges to," among other things, "the Region's decision to approve the Paradise Creek TMDL." Petitioner "should have" raised that challenge earlier.). As to the soundness of Maryland's WIP, for example, the Water Groups should have raised that challenge in the litigation over the EPA's decision to promulgate the Bay TMDL. *See* Brief for Water Groups at 40, *Blue Water Balt. v. Md. Dep't of the Env't* (No. 44) ("Nor does Appendix A to the Phase II WIP . . . explain how the twenty-percent restoration requirement relates to the need to reduce the discharge of pollutants . . . .").

strategy as an effective state-wide method of improving the Chesapeake Bay. *See* Maryland's Chesapeake Bay Tributary Strategy Statewide Implementation Plan 16 (2008) (stormwater strategy). Thus, MDE's decision to include the 20% restoration requirement in the Montgomery County Permit was also supported by substantial evidence and was not arbitrary and capricious.

We further disagree with the Water Groups' position that the 20% restoration requirement is insufficient because it does not relate to other TMDLs. Indeed, the Permits incorporate a requirement to submit plans regarding WLAs for all EPA-approved TMDLs. That requirement ensures the Permits address all applicable TMDLs.[47]

## C. The Methodology in the Guidance

Finally, with respect to the 20% restoration requirement, the Water Groups object to MDE's method of calculating impervious surface area not restored to the MEP. They assert that the Guidance, which MDE incorporated into these Permits by reference, is flawed because MDE arbitrarily selected 2002 as the baseline for measuring impervious surface area. For example, the Water Groups allege that MDE has ignored the current definition for MEP in the agency's own regulations.

---

[47] We also find unpersuasive the Water Groups' reliance on the EPA's discussion of the MEP standard when the EPA promulgated rules for MS4 permitting. *See* NPDES— Regulations for Revision of the Water Pollution Control Program Addressing Storm Water Discharges, 64 Fed. Reg. 68,722, 68,754 (Dec. 8, 1999). Although the Water Groups stress that "specific local concerns" are a factor for MS4s to consider in selecting controls to reduce pollutant discharges, that factor is one of many from a non-exclusive list. The more enlightening aspect of the EPA's commentary is that the agency "intentionally [did] not provide[] a precise definition of MEP to allow maximum flexibility in MS4 permitting." *Id.*

We disagree with the Water Groups because MDE reasonably justifies its decision based on the accurate determination that 2002 marked a significant milestone in the State's treatment of water quality. *See Najafi*, 418 Md. at 173, 12 A.3d at 1261 (discussing the substantial evidence test); *Natural Res. Def. Council*, 808 F.3d at 569 (discussing the arbitrary and capricious test).

MDE explained its selection of 2002 in the Guidance: "Maryland regulations and local ordinances began requiring BMPs [around this time] to address a specific suite of volumes [recharge (Re$_v$), water quality (WQ$_v$), and channel protection (Cp$_v$)] and it can therefore be justified that water quality treatment has been provided to the MEP." MDE, Guidance at 4. In proposing new regulations for stormwater management in 2000, MDE explained: "The resulting program will provide water quality treatment of up to 90 percent of the average annual rainfall throughout the State, establish ground water recharge standards, and outline a channel erosion control strategy." 27 Md. Reg. at 1168. Additionally, MDE explained that prior regulations had provided "sparse guidance" on "water quality enhancement." *Id.* To bolster MDE's focus on water quality, the agency incorporated the Manual by reference into the 2000 regulations. *See id.* at 1170; *see also* CWP & MDE, Manual § 2.1, at 2.2 ("The WQ$_v$ is directly related to the amount of impervious cover created at a site.").

The Water Groups reject MDE's decision by arguing that Maryland's regulations *currently* define "maximum extent practicable" based on a different requirement the State imposed after 2002. That is, COMAR 26.17.02.02B(22) defines MEP as the design of "stormwater management systems so that all reasonable opportunities for using *ESD*

42

planning techniques and treatment practices are exhausted and, only where absolutely necessary, a structural BMP is implemented." (Emphasis added.)

MDE has explained, however, that pursuant to the Stormwater Management Act of 2007, which precipitated the regulatory change the Water Groups refer to,[48] the performance requirement ESD pertains to "future development," not to restoration. MDE, Basis for Final Determination. As set forth in EN § 4-203(b)(1), "[t]he rules and regulations shall [i]ndicate that the primary goal of the State and local programs will be to maintain *after development*, as nearly as possible, the predevelopment runoff characteristics.") (emphasis added). *See also* COMAR 26.17.02.01B ("These regulations for stormwater management apply to the development or redevelopment of land . . . ."). MDE has reached a correct legal conclusion, and one regarding the law in which the agency has expertise. *See John A.*, 400 Md. at 381–82, 929 A.2d at 147 ("In reviewing an agency's legal conclusions, it is a fundamental principle of administrative law that a reviewing court should not substitute its judgment for the expertise of those persons who constitute the administrative agency."). We find no error here.

Although the agency selected ESD as the MEP via regulation in 2009,[49] MDE chose 2002 because that year marked the beginning of the stormwater management era when BMPs were subjected to performance standards to better treat water quality. 27 Md. Reg. at 1168. $WQ_v$ is one such standard. CWP & MDE, Manual § 1.2, at 1.13. The Manual

---

[48] *See* Fiscal and Policy Note, H.B. 786, 2007 Sess. (2007).

[49] *See* 36 Md. Reg. 652, 652 (April 24, 2009) (to be codified at COMAR 26.17.02.02B(22)).

shows a direct relationship between the amount of impervious surface and $WQ_v$. *Id.* § 2.1, at 2.3 (Figure 2.2). Thus, beginning in 2002, Maryland connected stormwater management practices to the restoration of impervious surface area, which is the Permit requirement at issue. MDE's conclusion that the Counties should calculate impervious surface area using 2002 as a baseline as part of the 20% restoration requirement was supported by substantial evidence and was not arbitrary and capricious. *See Banks*, 354 Md. at 69, 729 A.2d at 381 ("[T]he expertise of the agency in its own field should be respected.").[50]

Because we uphold the Guidance as a component the Counties may legally use to achieve the 20% restoration requirement, we must address whether Montgomery County can use this methodology, too. We recognize that MDE issued the Montgomery County Permit before MDE prepared the Guidance. *Compare* Montgomery County Permit: Part I: C (Effective Date: February 16, 2010), *with* MDE, Basis for Final Determination at 10 (MDE held meetings with the Counties about the Guidance from August 2010 to February 2011 before completing it in June 2011.). As we have discussed, MDE limited the practices the County could implement by connecting restoration to the Manual. But, importantly, MDE did not limit the manner in which Montgomery County could *show* its compliance with the 20% restoration requirement. *See, e.g.*, Montgomery County Permit: Part G.2

---

[50] Moreover, MDE explained that it designed the Permit to incentivize use of ESD even though it did not tailor the 20% restoration requirement to this concept. MDE, Basis for Final Determination ("[T]he Guidance clearly shows that ESD practices will be given greater pollutant load reductions than other acceptable water quality treatment practices."); *see* MDE, Accounting for Stormwater Wasteload Allocations and Impervious Acres Treated, Guidance for National Pollutant Discharge Elimination System Stormwater Permits at 10, Table 4: Structural BMP Retrofit Matrix (2011) [hereinafter "the Guidance"].

(Watershed Restoration), Part IV.A (Annual Reporting). Because the Permit does not restrict how the County must show its progress in achieving the 20% restoration requirement and because of the important links we have already analyzed between the Guidance and the Manual (i.e., the WQ$_v$ standard), we conclude that Montgomery County can rely on the Guidance in showing its compliance with this requirement.

### Part II: TMDL Plans

As we discussed at the outset of this opinion, TMDLs are informational tools, of which WLAs—wasteload allocations—are critical. As the District Court for the Middle District of Pennsylvania aptly noted, "WLAs are not permit limits *per se*; rather they still require translation into permit limits . . . ." *Am. Farm Bureau Fed'n*, 984 F. Supp. 2d at 328 (citation and internal quotation marks omitted) (emphasis in original). The EPA requires such translation pursuant to 40 C.F.R. § 122.44(d)(1)(vii)(B), which the Water Groups argue MDE failed to comply with.[51]

Pursuant to 40 C.F.R. § 122.44(d)(1)(vii)(B), MDE included a provision that requires the Counties to submit plans for all EPA-approved TMDLs one year after the issuance of the Permits (or alternatively, one year after the EPA approves the TMDL).[52]

---

[51] After analyzing this challenge, we will return to discuss the TMDL planning requirement in the final section of this opinion, which concerns the Water Groups' argument that all the Permits fail to comply with federal and state public participation laws.

[52] We shall sometimes refer to this Permit requirement as the TMDL implementation plans or the restoration plans. We stress that this requirement is distinct from the 20% restoration requirement. The operative word here is *plan* whereas the operative phrase with respect to the 20% restoration requirement is *restoration of 20% of impervious surface area*. In other words, MDE is assessing the former by looking for the submission of a

45

In creating these restoration plans, the Counties must select actions (including cost estimates) and set forth a schedule (including deadlines and pollution reduction benchmarks) to meet WLAs. Because MDE foresaw the process of meeting WLAs as "iterative," the Counties must also describe what actions they will take when they fail to make progress in meeting WLAs.[53]

**Effluent Limitations Must Be Consistent with WLAs**

40 C.F.R. § 122.44(d)(1)(vii)(B) requires MDE to establish effluent limitations that take into account WLAs:

> When developing water quality-based effluent limits under this paragraph **the permitting authority shall ensure that**[] . . . **[e]ffluent limits** developed to protect a narrative water quality criterion, a numeric water quality criterion, or both, **are consistent with the assumptions and requirements of any available wasteload allocation** for the discharge prepared by the State and approved by EPA pursuant to 40 CFR 130.7.

(emphasis added).

The Water Groups construe the contents of the TMDL implementation plans, that is, the actions and deadlines discussed *supra*, as effluent limitations. As they put it, nothing else in the Permits is "remotely capable of . . . impos[ing] effluent limitations that are consistent with the assumptions and requirements of TMDLs." Thus, the Permits can only be in compliance with 40 C.F.R. § 122.44(d)(1)(vii)(B) when MDE has reviewed *the*

---

planning document and analyzing the latter by reviewing the amount of impervious surface area the Counties have restored.

[53] As we mentioned earlier, we sometimes refer to this process as the adaptive management approach to the Counties' implementation of BMPs.

*contents* of the TMDL implementation plans. The problem for MDE, then, is one of timing. Because MDE will review the contents one year *after* issuing the Permits, the Water Groups conclude that MDE cannot know whether the effluent limitations in the Permits are consistent with the WLAs.

We disagree with the Water Groups because (1) 40 C.F.R. § 122.44(d)(1)(vii)(B) is, like the MEP standard, flexible as to how a permitting authority complies with this regulation and (2) MDE has complied with the regulation by incorporating the WLAs (the most critical element of the regulation) into the Permits and by using an "iterative" process of agency review and program change to ensure progress in meeting the WLAs.

Before we analyze MDE's "iterative" process, we must take issue with the Water Groups' position that the *contents* of the restoration plans are effluent limits. We understand the effluent limits to be best management practices ("BMPs").[54] But, importantly, the Permits do not incorporate these effluent limits in the restoration plans but in another section of the Permits—Part III.E. That is, the Counties must implement a stormwater management program ("SWMP"), including the "practices found in the *2000 Maryland Stormwater Design Manual*."[55] Importantly, the Permits instruct that "these

---

[54] The EPA provided guidance that, at the time MDE was designing the Permits, endorsed this approach. *See* EPA, 2002 Memo at 4 (Effluent limits "should be expressed as best management practices (BMPs) or other similar requirements, rather than as numeric effluent limits."); EPA, 2010 Memo at 3 ("Where WQBELs in permits for stormwater discharges from MS4s . . . are expressed in the form of BMPs, the permit should contain objective and measurable elements (e.g., . . . level of BMP performance.)."). The level of BMP performance, as we have discussed, is the $WQ_v$ standard.

[55] These practices are best management practices. *See, e.g.*, CWP & MDE, Manual § 1.3 ("[Chapter 2] also briefly outlines the six groups of acceptable BMPs that can be used

47

[management] programs shall be integrated with other permit requirements to promote a comprehensive adaptive approach toward solving water quality problems." In this light, we understand the TMDL implementation plans as roadmaps because they *describe* a plan for achieving a goal (using BMPs to meet WLAs). *See, e.g.*, Montgomery County Permit Part III.J (In the TMDL implementation plans, the County must "describe those actions necessary to meet the storm drain system's share of WLAs in EPA approved TMDLs."). The requirement to implement BMPs, however, exists independent of the requirement to submit the TMDL implementation plans.

Having clarified this matter, we turn to the regulation to better understand MDE's obligation with respect to effluent limits and WLAs. We note that the plain text imposes a duty on the permitting authority to ensure that effluent limits are consistent with WLA assumptions and requirements. *See In re City of Moscow, Idaho*, 2001 WL 988721, at *9 ("[T]he governing regulations require *consistency . . . .*") (emphasis in original). But the text does not instruct the permitting authority as to how it must ensure this consistency. *See id.* at 8 (noting the lack of detail in the regulation). Instead, the EPA set a minimal, flexible requirement in which the permitting authority is to design a scheme where effluent limits are compatible or in agreement with WLAs. *See* National Pollution Discharge Elimination System, 54 Fed. Reg. 23,868, 23,870, 23,879 (June 2, 1989) (codified at 40 C.F.R. § 122.44) ("Subparagraph (vii) does not prescribe detailed procedures for

---

to meet recharge and water quality volume sizing criteria."); *see also* COMAR 26.17.02.02A, B(5) (defining BMP as it relates to the Manual and the stormwater management chapter of COMAR).

developing water quality-based effluent limits. Rather, the regulation prescribes minimum requirements for developing water quality-based effluent limits, and at the same time, gives the permitting authority the flexibility to determine the appropriate procedures for developing water quality-based effluent limits."); *The American Heritage Dictionary of the English Language* 392 (4th ed. 2006) (Consistent means in agreement or compatible.)[56]; *cf. Am. Farm Bureau Fed'n*, 984 F. Supp. 2d at 328 ("Accordingly, in some circumstances, a state may write a NPDES permit limit that is different from the WLA, provided that it is consistent with the operative assumptions underlying the WLA.").

*In re City of Moscow, Idaho* is illustrative of the flexibility the regulation affords MDE. There, the Environmental Appeals Board rejected the City of Moscow's petition for review of an EPA-issued NPDES permit. 2001 WL 988721, at *1. In pertinent part, the Board concluded that the EPA (Region X) did not err in creating permit limits although the EPA did not incorporate the design flow rate of an applicable TMDL. *Id.* at *8–9. After reviewing 40 C.F.R. § 122.44(d)(1)(vii)(B) and the regulatory history, *see* 54 Fed. Reg. 23,868, 23,879, the Board explained that there was no law or rule prescribing how the EPA was to select a flow rate to create effluent limits, *In re City of Moscow, Idaho*, 2001 WL 988721, at *8. The Board concluded that the agency acted "well within the discretion accorded [it] under the applicable regulatory scheme." *Id.* at *9.

---

[56] "When conducting a 'plain meaning analysis,' dictionary definitions 'provide a useful starting point for discerning what the legislature could have meant in using a particular term.'" *Preston v. State*, 444 Md. 67, 84, 118 A.3d 902, 912 (2015) (internal quotation marks omitted) (citations omitted).

So too here. No law or regulation specifies how or burdens MDE in undertaking the process of complying with 40 C.F.R. § 122.44(d)(1)(vii)(B). In fact, as we have discussed, the overarching federal law for MS4s—33 U.S.C. § 1342(p)(3)(B)(iii)—is broad and flexible, too. *See Natural Res. Def. Council*, 966 F.2d at 1308.

Under the Permits, the Counties must include in the TMDL implementation plans the actions needed to meet "WLAs in EPA approved TMDLs." Part III.J.1. Thus, the Permit ties the activities to WLAs, not to some other benchmark that could be inconsistent with the WLA. As the Permits make clear, "[a]ll EPA approved TMDL's that establish WLA's applicable to the County's storm drain system are incorporated by reference into this permit." *Id.*

The Counties must also submit "documentation of progress toward meeting applicable WLAs developed under EPA approved TMDLs." Reporting on WLA progress is reinforced through watershed assessment and restoration requirements. *See* Part III.F ("[W]atershed assessments shall [s]pecify how restoration efforts will increase progress toward meeting any applicable WLAs included in EPA approved TMDLs."); Part III.G (The Counties shall annually report on progress toward meeting WLAs.).

Moreover, "MDE will review program implementation, annual reports, and periodic data submittal on an annual basis." The Permit requires "BMP and program modifications" if this report fails to "show progress toward meeting WLAs." The modifications are a product of the "iterative approach" the Counties must follow if they do not make progress in achieving WLAs. That is, the Counties must propose "additional or alternate stormwater controls" to meet WLAs, which MDE will review and approve, if adequate.

50

*Environmental Defense Center, Inc. v. United States Environmental Protection Agency* ("*EDC*") is instructive on the importance of permittee reporting and agency review to ensure compliance with the law. 344 F.3d 832, 858 (9th Cir. 2003). In *EDC*, the Ninth Circuit vacated a portion of an EPA rule that permitted small MS4s to discharge under a general permitting scheme, and remanded for the EPA to revise the rule to comply with the CWA. *Id.* at 858.[57] The Ninth Circuit stated that the rule did not require the permitting authority to review the MS4 operator's stormwater management program "to ensure" that the operator's program would "*in fact*" comply with the relevant law. *Id.* at 855 (emphasis in original). Thus, the Ninth Circuit concluded that "nothing prevents the operator of a small MS4 from misunderstanding or misrepresenting its own stormwater situation." *Id.*

The scheme the Ninth Circuit rejected in *EDC* is materially different from the scheme in the Permits here. MDE requires reporting, assessment, and adaptation to ensure that the Counties' BMPs will make progress to achieve WLAs. We find the effluent limits under this scheme to be consistent with approved WLAs. *See id.* at 856 ("However, stormwater management programs that are designed by regulated parties must, in every instance, be subject to meaningful review by an appropriate regulating entity . . . ."). Thus, the Permits comply with 40 C.F.R. § 122.44(d)(1)(vii)(B).

---

[57] In a general permitting scheme, a general permit is established with set limits and requirements. *See Envtl. Def. Ctr., Inc. v. EPA*, 344 F.3d 832, 853 (9th Cir. 2003). Then, a discharger may file a notice of intent ("NOI"), through which the discharger agrees to discharge under the terms of the general permit. *Id.* "[T]he NOI represents no more than a formal acceptance of terms elaborated elsewhere." *Id.*

## Part III: Monitoring

Here, the Water Groups raise two arguments: the Permits do not include federally mandated monitoring to (1) produce representative data in the MS4 jurisdictions and (2) assure compliance with Permit requirements. They contend that MDE elected not to comply with federal regulations that impose the above requirements and that the record does not otherwise show that MDE complied with these laws. MDE responds by defending its monitoring scheme as sufficient to comply with the applicable federal regulations. Moreover, MDE argues that some of the federal provisions are inapposite because they only pertained to the initial application for MS4 permits in the 1990s.

### A. The Permit's Monitoring Requirements

We begin by noting what the Permits require. Under Part III.F, each County must conduct chemical, biological, and physical monitoring at one outfall and an associated in-stream station.[58] The Permits set forth the number of required monitoring events, sampling methods, pollutants, and locations.[59] The Counties must also conduct monitoring of stream

---

[58] The designated locations in Anne Arundel County are the Parole Plaza outfall and Church Creek in-stream station in the South River watershed. The watershed in Baltimore County is the Scotts Level Branch watershed. The watershed in Prince George's County is the Bear Branch watershed. Baltimore City's location is the Moores Run. Although Montgomery County's Permit states that the watershed is the Lower Paint Branch watershed, Part III.H.1, the location was changed to the Sligo Creek Watershed after it was determined that the prior location was no longer effective for monitoring purposes. *See* Montgomery County Department of Environmental Protection, Annual Report for 2010 NPDES MS4 Permit, at III-26.

[59] For chemical monitoring, the Counties must monitor 12 storm events each year, use automated or manual sampling methods, submit three representative samples for laboratory analysis under EPA approved methods, and record continuous flow measurements. Part IV.F.1. The Counties must obtain pollutant samples for biochemical

52

channel protection.[60] These two levels of monitoring occur at different locations. *Compare* note 58, *with* note 60.

## B. Applicable Law

We now consider what federal monitoring regulations apply to the Permits. Under 40 C.F.R. § 122.48(b), "[*a*]*ll permits shall specify* [r]equired monitoring including type, intervals, and frequency sufficient to yield data which are representative of the monitored activity including, when appropriate, continuous monitoring." (Emphasis added.) Moreover, monitoring requirements must "assure compliance with permit limitations." 40 C.F.R. § 122.44(i)(1); *see also In re Gov't of the D.C. Mun. Separate Storm Sewer Sys.*, 10 E.A.D. 323, 2002 WL 257698, at *20 (Feb. 20, 2002) ("First, both section 122.48(b) and section 122.44(i) would appear to require that certain monitoring conditions be included in all permits."). The Clean Water Act makes plain the EPA's broad authority to

---

oxygen demand, total Kjeldahl nitrogen, nitrate plus nitrite, total suspended solids, total petroleum hydrocarbons, e. coli or enterococcus, total lead, total copper, total zinc, total phosphorus, and hardness. *Id.* The Counties must also record continuous flow measurements and use the data to estimate pollutant load reductions. *Id.* And the Counties must report such estimates for EPA approved TMDLs. *Id.*

For biological monitoring, the Counties must annually gather benthic macroinvertebrate samples through approved methods. For physical monitoring, they must conduct a geomorphologic stream assessment, a stream habitat assessment, and use a hydrologic and/or hydraulic model to analyze the effects of rainfall, discharge rates, stage, and if necessary, continuous flow on channel geometry. *Id.* Benthic pertains to species living on the floor of a waterbody. Chesapeake Bay Program, Chesapeake Bay: Introduction to an Ecosystem at 3.

[60] In Anne Arundel County, the designated location is the Picture Spring Branch in the Severn River watershed. In Baltimore County, it is the Windlass Run watershed. In Prince George's County, it is the Black Branch watershed. In Baltimore City, it is the Stony Run Watershed. And in Montgomery County, it is the Clarksburg Special Protection Area.

set these requirements. 33 U.S.C. § 1318(a); *Natural Res. Def. Council, Inc. v. EPA*, 863 F.2d 1420, 1434 (9th Cir. 1988) (The EPA "has wide discretion and authority to determine monitoring requirements in NPDES permits . . . ."). These requirements apply to state programs. 40 C.F.R. § 123.25(15), (19).

The Water Groups point us to an additional regulation as part of their argument that the Permits are not capable of producing representative data. Specifically, pursuant to 40 C.F.R. § 122.26(d)(2)(iii)(D), applicants for large MS4s must submit a "proposed monitoring program for representative data collection for the term of the permit that describes the location of outfalls or field screening points to be sampled (or the location of instream stations)," and, among other things, "why the location is representative." But MDE disputes whether this regulation is even applicable to our analysis of the agency's decision to issue the Permits when the regulation, in its view, pertains to applicants (i.e., permittees). MDE argues that we should read 40 C.F.R. § 122.26(d)(2)(iii)(D) as relevant only to a permit *application*—not a permit—and, moreover, only to the *first cycle* of permit applications for MS4s (i.e., the early 1990s). In MDE's view, the agency had "the flexibility to establish requirements [it] deem[ed] appropriate" in subsequent MS4 permits.

Recognizing that 40 C.F.R. § 122.26(d) concerns "[a]pplication requirements," we nevertheless agree with the Water Groups that the regulation is relevant to our review of MDE's decision to issue the Permits. Although state and federal permitting laws are unhelpful, an EPA Policy Memorandum interpreting 40 C.F.R. § 122.26(d) ("the Policy

54

Memo")[61] is instructive. In the Policy Memo, the EPA instructs that "reapplications should focus on maintenance and improvement of [MS4 storm water management] programs" that were required in the initial applications. EPA, Interpretive Policy Memorandum on Reapplication Requirements for Municipal Separate Sewer Systems, 61 Fed. Reg. 41,698, 41,698 (Aug. 9, 1996) [hereinafter Policy Memo].[62] According to the Policy Memo, MDE can make changes to the MS4 monitoring program during the reapplication period, but such changes must be "appropriate and useful." *Id.* at 41,699. In other words, when a permittee reapplies for a discharge permit, and if the permitting authority reissues the permit, it is the permitting authority's responsibility to ensure that the reissued permit contains programs that are adequate in light of the initial application requirements in 40

---

[61] The parties do not dispute that we should accord considerable deference to the Policy Memo. Courts have turned to agency interpretations of their own regulations, if ambiguous, to discern how to understand them. *See Coeur Alaska, Inc. v. Se. Alaska Conservation Council*, 557 U.S. 261, 283 (2009) ("The regulations do not give a definitive answer to the question whether § 306 [of the CWA] applies to discharges regulated by the Corps under § 404 [of the CWA], but we do find that *agency interpretation* [in a memorandum from and to EPA officers] and agency application of the regulations are instructive and to the point.") (emphasis added).

[62] MDE's Bases for Final Determination explain that the Counties submitted their applications as part of their fourth annual reports. MDE followed the method the EPA suggested in the Policy Memorandum. *See* EPA, Interpretive Policy Memorandum on Reapplication Requirements for Municipal Separate Sewer Systems, 61 Fed. Reg. 41,698, 41,699 (Aug. 9, 1996) [hereinafter Policy Memo] ("MS4s may use the fourth year annual report . . . as the MS4 permit reapplication."). Regulating authorities in other jurisdictions have used the submission of an annual report as part of the permit reapplication process. *See Natural Res. Def. Council, Inc. v. N.Y. State Dep't of Envtl. Conservation*, 34 N.E.3d 782, 790 (N.Y. 2015) ("The vast majority of New York's 500 plus small MS4s achieved initial authorization to discharge stormwater prior to the effective date of the 2010 General Permit; they were able to maintain coverage under the 2010 General Permit by submitting their 2009 annual reports.") (citation omitted).

C.F.R. § 122.26(d). We rely, then, on 40 C.F.R. § 122.26(d) as a baseline to review the monitoring program in the Permits to ensure that MDE only made program changes that were "appropriate and useful." *Id.* at 41,699.

### C. The EPA Policy Memo

The EPA published the Policy Memo to "respond[] to requests from municipalities and NPDES permit writers for clarification about regulations which do not appear to address reapplication requirements, i.e., permit reissuance." 61 Fed. Reg. at 41,698.

In the Policy Memo, the EPA first explains that it does not require an applicant to repeat *in full* the process in 40 C.F.R. § 122.26(d)(1)-(2). *Id.* The EPA explained that it would be redundant to "request the same information again [including characterization of data at § 122.26(d)(2)(iii)], where it has already been provided and has not changed." *Id.* But an applicant "should identify any proposed changes or improvements" to "monitoring activities." *Id.*

If MS4 applicants and permit writers wish to change programs in future permits, the EPA explains, they may not only "de-emphasize" but also propose *to eliminate* a program component. *Id.* at 41,699; *see id.* at 41,698 ("MS4 permit applicants and NPDES permit writers have considerable discretion to customize appropriate and streamlined reapplication requirements on a case-by-case basis."). De-emphasis may be justified based on the discharger's experience during the first permit term. *Id.* By way of example, the EPA stated that "new information on the relative magnitude of a problem" and "new data on water quality impacts of storm water discharges" could justify program changes. *Id.* Moreover, elimination could be justified "when a different water quality program would

56

serve the same goals." *Id.* We construe the phrase "same goals" as referring to the CWA's objective in Chapter 26 of Title 33 of "restor[ing] and maintain[ing] the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a); *see* 33 U.S.C. § 1318(a)(1)(A)(i) ("Whenever required to carry out *the objective* of this chapter [26: Water Pollution Prevention and Control], . . . . the Administrator shall require the owner or operator of any point source to establish and maintain such records . . . [and use such monitoring methods] . . . as he may reasonably require.") (emphasis added).

If MS4 applicants and permit writers wish to change monitoring programs, the EPA encouraged them "to determine if storm water monitoring efforts are appropriate and useful." 61 Fed. Reg. 41,699. The EPA then suggested alternative techniques: "municipalities may wish to consider using monitoring techniques *other than* end-of-the pipe chemical-specific monitoring, including habitat assessments, bioassessments, and/or other biological methods." *Id.* (emphasis added).

### D. Representative Monitoring

MDE argues, somewhat correctly, that the Policy Memo grants it "the flexibility to establish requirements [it] deem[s] appropriate." The Water Groups only repeat the language of the Policy Memo, arguing that MDE can change programs to make them "more appropriate and useful." They argue that MDE's decision was not supported by substantial evidence. Although the Policy Memo does grant NPDES permit writers, like MDE, the flexibility to modify program components, including monitoring, 61 Fed. Reg. at 41,699, the EPA does not allow permit writers to reissue permits and abdicate their responsibility in "restor[ing] and maintain[ing] the chemical, physical, and biological integrity of the

57

Nation's waters." 33 U.S.C. § 1251(a). 40 C.F.R. 122.26(d) required, among other things, a "proposed monitoring program for representative data collection for the term of the permit that describes the location of outfalls or field screening points to be sampled (or the location of instream stations)," and, among other things, "why the location is representative." And as we also discussed earlier, the Permits must include monitoring "sufficient to yield data which are representative of the monitored activity." 40 C.F.R. § 122.48(b).

We conclude that MDE's monitoring program in the Permits will produce representative data because MDE has (1) ensured that the Counties monitor stormwater discharges at monitoring locations that represent an adequate range of land uses statewide, and (2) increased the frequency of monitoring to yield more representative information at the County level.

MDE revised the MS4 monitoring program in the late 1990s to implement a monitoring approach called the "three legged stool," so named because it incorporated not only "[c]hemical testing" but also "biological criteria" and "physical assessments." MDE, Maryland's NPDES Municipal Stormwater Monitoring at § 4.2 (1997); *see also* MDE, Basis for Final Determination to Issue Anne Arundel County's NPDES MS4 Permit. The agency articulated this approach as being "more aligned with the CWA's goal to 'restore and maintain the *chemical*, *physical*, and *biological* integrity of the nation's waters.'" MDE, Maryland's NPDES Municipal Stormwater Monitoring at § 4.2 (emphasis added); *see also* MDE, Basis for Final Determination to Issue Anne Arundel County's NPDES MS4 Permit. MDE also increased the frequency of monitoring so that the Counties needed

to monitor twelve storm events instead of three. MDE, Maryland's NPDES Municipal Stormwater Monitoring at § 4.0. Finally, in light of the increase in monitoring *type*, MDE decreased the number of monitoring sites to one outfall and one associated in-stream station in a watershed. *Id.* at § 4.3.

The agency explained that it adopted the "three legged stool" approach after an analysis of the MS4s' concerns in implementing the first permits: "local governments argued that in many instances, *biological* and *physical* monitoring results are better indicators of small stream health." Maryland's NPDES Municipal Stormwater Monitoring § 4.1; MDE, Basis for Final Determination to Issue Anne Arundel County's NPDES MS4 Permit (2013) (emphasis added). MDE acknowledged the local jurisdictions' concern that "water chemistry data are of little value" in discerning the effects of stormwater in local streams when there is no assessment of stormwater as to "physical stream habitat and biological health." MDE, Maryland's NPDES Municipal Stormwater Monitoring at § 4.1. Nevertheless, MDE explained in its analysis that "[t]here is still a need to continue water chemistry work for the far field objectives of nutrient reduction in the Bay and accurate loading estimates for NPDES." *Id.* at § 4.2.

In explaining its decision to increase the number of monitored storm events, MDE stated that "more frequent sampling" would "improve pollutant load estimates." MDE, Maryland's NPDES Municipal Stormwater Monitoring at § 4.0.

Moreover, in explaining why it pared the number of chemical monitoring sites, MDE stated that the addition of biological and physical monitoring required the agency to reapportion resources. *Id.* at § 4.3. To compensate for the reduced number of sites, MDE

59

explained that: (1) "[a] major goal for future monitoring will be to integrate water chemistry, biology, and physical assessments in one suitable watershed" to ensure "all three techniques [are] analyzed holistically"; and that (2) "site selection will be orchestrated at the state level" to "maintain an adequate number of residential, commercial, and industrial sites for State water chemistry needs." MDE, Maryland's NPDES Municipal Stormwater Monitoring at § 4.3.[63]

MDE's decision-making illustrates that, as the Policy Memo stated, the permitting authority and permittees worked together to "determine if storm water monitoring efforts [were] appropriate and useful." 61 Fed. Reg. at 41,699. MDE did not rubber stamp the jurisdictions' proposal but affirmed that "[t]here is still a need to continue water chemistry work for the far field objectives of nutrient reduction in the Bay and accurate loading estimates for NPDES." MDE, Maryland's NPDES Municipal Stormwater Monitoring at § 4.2.[64]

---

[63] As the initial permit application requirements indicate, the appropriate land uses that a permittee was to monitor were commercial, residential, and industrial. *See* 40 C.F.R. § 122.26(d)(2)(iii)(A).

[64] MDE also took into consideration the financial burden on local jurisdictions in revising the monitoring program: "The cost for establishing four monitoring sites with either automated equipment or staff and having numerous storm events sampled and analyzed [as required of NPDES MS4 permits] makes this one of the more expensive undertakings for local jurisdictions." MDE, Maryland's NPDES Municipal Stormwater Monitoring § 4.1 (1997). Although the Policy Memo does not explicitly include cost as a factor in making program changes, it does state that "[c]hanges to the stormwater management program may be justified due to the availability of *new information* on the relative magnitude of a problem." EPA, Interpretive Policy Memorandum on Reapplication Requirements for Municipal Separate Sewer Systems, 61 Fed. Reg. 41,698, 41,699 (Aug. 9, 1996) (emphasis added) [hereinafter Policy Memo]. Research on the cost

Moreover, biological and physical monitoring are within the scope of the EPA's suggestions for alternative techniques, that is, "monitoring techniques *other than* end-of-the pipe chemical-specific monitoring, including habitat assessments, bioassessments, and/or other biological methods." 61 Fed. Reg. at 41,699 (emphasis added).

By increasing the number of monitored storm events,[65] MDE intended for the Counties to acquire more *representative* data about pollutant loads. *Compare* 61 Fed. Reg. at 41,699 (The EPA encouraged permit writers "to determine if storm water monitoring efforts are appropriate and useful."), *with* 40 C.F.R. § 122.62(d)(2)(iii)(D) (The initial application called for "[a] proposed monitoring program for representative data collection.").[66]

---

to undertake certain monitoring requirements strikes us as information relevant in considering programmatic changes.

Moreover, we cannot view MDE's decision in a vacuum. In light of MDE's addition of biological and physical monitoring, MDE stated that "[t]o be fair, current chemical requirements, at least in terms of monitoring sites, need to be pared with a commensurate reapportionment of resources to accommodate the two additional stool legs." MDE, Maryland's NPDES Municipal Stormwater Monitoring at § 4.3. We believe it was reasonable for MDE to reallocate resources for its revised program to further the objective of "restor[ing] and maintain[ing] the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).

[65] MDE has amassed a wealth of data from monitoring stormwater throughout the State: "Since the inception of the NPDES stormwater program, Maryland's MS4 jurisdictions have monitored more than 2,745 storm events along with an additional 1,605 sampling activities during baseflow conditions." MDE, Basis for Final Determination to Issue Anne Arundel County's NPDES MS4 Permit.

[66] The Water Groups argue: "[T]he monitoring location for Baltimore City – Moores Run – is located on the eastern edge of the City near the border with Baltimore County, and is located within the Back River watershed which is just one of four major watersheds that receives discharges from the City's MS4." MDE's approach illustrates that

61

The Water Groups insist on interpreting *representative* in terms of the boundaries of the political subdivisions. In its analysis of the Counties' initial monitoring experiences, MDE explained that site selection was a challenging undertaking, and one that it had to interpret flexibly so that the Counties could reasonably carry out their monitoring duties. That is, "monitoring only five sites did not allow any single jurisdiction to monitor all possible land uses." Maryland's NPDES Municipal Stormwater Monitoring at § 2.3. From MDE's perspective, however, the state-wide program to improve water quality was maintained by, "*in the aggregate*," monitoring "the continuum from low density residential to heavy industrial sites." *Id.* (emphasis added). The watersheds MDE has approved extend from low-density residential land use to commercial use and light industrial use.[67]

---

*representative* does not only reflect the boundaries of the political subdivisions. Increasing the *frequency* of monitoring at a location is a way to yield more representative data.

To the extent that the Water Groups insist on interpreting *representative* only with respect to the boundaries of the political subdivisions, we note that the Permits require "detailed" watershed assessments "for the *entire* County." Part IV.E.1 (emphasis added). The assessment shall include the following activities: "[d]etermin[ing] current water quality problems"; "[i]nclud[ing] the results of a visual watershed inspection"; and "[i]dentify[ing] and rank[ing] water quality problems." *Id.* This Permit requirement facilitates comprehensive data collection in each jurisdiction.

[67] For a comparison of land uses, see Anne Arundel County Department of Public Works, 2013 Annual Report (NPDES MS4 Permit) § III-73, *available at* http://www.aacounty.org/departments/public-works/wprp/npdes-ms4-permit/; Baltimore County Government, 2014 NPDES Annual Report § 10-4, *available at* http://www.baltimorecountymd.gov/Agencies/environment/npdes/index.html; City of Baltimore Department of Public Works et al., 2011 Annual Report (NPDES MS4 Permit); MDE, Review of Prince George's County's 2009 Annual Report (NPDES MS4 Permit), *available at* http://www.mde.state.md.us/programs/Water/Stormwater ManagementProgram/SedimentandStormwaterHome/Documents/Prince%20George%20 3-6%20Annual%20Report%20Review.pdf; Montgomery County Department of Environmental Protection, Breewood Tributary Restoration, *available at*

Thus, we conclude MDE has approved of monitoring locations that adequately *represent* a continuum of land uses for the agency and the Counties to collect data. *See* MDE, Maryland's NPDES Municipal Stormwater Monitoring at § 4.3 ("[S]ite selection will be orchestrated at the state level" to "maintain an *adequate* number of residential, commercial, and industrial sites for State water chemistry needs.") (emphasis added).

MDE amended the program with the CWA's objective at the forefront of its mind: "restor[ing] and maintain[ing] the chemical, physical, and biological integrity of the Nation's waters." *Id.*; *see* 33 U.S.C. § 1251(a). In accordance with the Policy Memo, the agency's changes and reasoning strike us as thorough efforts to make the monitoring program "appropriate and useful." 61 Fed. Reg. at 41,699. We conclude that MDE acted within the discretion the EPA accorded it in the Policy Memo. Thus, we also conclude that MDE has committed no legal errors pertaining to 40 C.F.R. § 122.26(d)(2)(iii)(D).

For many of the same reasons, we believe that the Permits contain monitoring "sufficient to yield data which are representative of the monitored activity." 40 C.F.R. § 122.48(b). The Permits require monitoring of many pollutants. Part IV.F.1.a-d.[68]

---

http://www.montgomerycountymd.gov/DEP/Restoration/breewood.html (last visited Feb. 11, 2016).

[68] Part IV.F.1. The Counties must obtain samples representative of a dozen storm events for biochemical oxygen demand, total Kjeldahl nitrogen, nitrate plus nitrite, total suspended solids, total petroleum hydrocarbons, e. coli or enterococcus, total lead, total copper, total zinc, total phosphorus, and hardness. *Id.* Consequently, "the resulting data will accurately portray the most common conditions for each site." EPA, NPDES Storm Water Sampling Guidance Document § 2.7.1, at 18 (1992). The Counties must also ensure that a laboratory analysis of these samples is conducted under EPA approved methods. Part IV.F.1.a.

63

Following the Counties' first experience implementing MS4 permits, MDE increased the frequency of monitoring to "improve pollutant load estimates." MDE, Maryland's NPDES Municipal Stormwater Monitoring § 4.0. The agency also decided to orchestrate site selection at the state level to "maintain an adequate number of residential, commercial, and industrial sites for State water chemistry needs." *Id.* § 4.3. By taking control of the selection of monitored sites, MDE could better ensure monitoring of a continuum of activities (industrial, residential, and commercial). Additionally, the Counties will have to explain their monitoring process to ensure that the agency can evaluate whether they have complied with MDE's requirements. Part V.A.1.b. (The Counties shall submit annual reports and include "[a] narrative summary describing the results and analyses of data, including monitoring data that is accumulated throughout the reporting year.").[69]

---

[69] When the EPA issued the initial permit application requirements for MS4s, the EPA set criteria to make storm events and sampling representative. 40 C.F.R. § 122.26(d)(2)(iii) (citing 40 C.F.R. § 122.21(g)(7)); *see* EPA, NPDES Storm Water Sampling Guidance Document § 2.7.1, at 18 (1992) ("These criteria were established to: (1) ensure that adequate flow would be discharged; (2) allow some build-up of pollutants during the dry weather intervals, and (3) ensure that the storm would be 'representative,' (i.e., typical for the area in terms of intensity, depth, and duration)."). To wit, a storm event must be "greater than 0.1 inch," "at least 72 hours" after the "previously measured storm event," and the sample must be for a "flow-weighted composite sample" taken for "either the entire discharge or for the first three hours of the discharge." 40 C.F.R. § 122.21(g)(7).

As we discussed, it is ambiguous whether this regulation (40 C.F.R. § 122.26(d)(2)) pertains to subsequent permit applications and, thus, to this case. Thus, we turn again to the EPA Policy Memo which clarifies reapplication requirements. EPA, Interpretive Policy Memorandum on Reapplication Requirements for Municipal Separate Sewer Systems, 61 Fed. Reg. 41,698, 41,698 (Aug. 9, 1996) [hereinafter "Policy Memo"]. The EPA encouraged "permitting authorities to work with permittees to determine if storm water monitoring efforts are appropriate and useful," and to "propose changes to make the program more appropriate and useful." *Id.* at 41,699. Because MDE did not propose any changes to the EPA's sampling criteria, *see* MDE, Maryland's NPDES Municipal Stormwater Monitoring, at §§ 4.0–4.3; App'x. 5, we conclude that these criteria should

64

MDE also requires the Counties to assess WLAs, which represent pollutant loads. Part IV.E.2.b.iii. The Counties must record continuous flow measurements to obtain data to estimate pollutant reductions. Part IV.F.1.a.iv. Because the Counties are to achieve WLAs over time through restoration activities, MDE requires the Counties to conduct such monitoring "where the *cumulative* effects of watershed restoration activities can be assessed." Part IV.F.1 (emphasis added).

MDE thus structured the Permits and imposed requirements on the Counties to ensure that they will monitor the discharge of pollutants to yield representative data. We conclude that the Permits comply with 40 C.F.R. § 122.48(b).

## E. Permit Limitations

40 C.F.R. § 122.44(i) requires monitoring "to assure compliance with permit limitations." We begin by noting the two applicable limitations: (1) controls to reduce the discharge of pollutants[70] and (2) the restoration of 20% of impervious surface area not restored to the MEP. *See* Part III.D; Part III.E.2.[71]

_____

inform MDE's assessment of the Counties' chemical monitoring summary and, specifically, whether the Counties obtained *representative* samples of pollutants.

[70] 33 U.S.C. § 1342(p)(3)(B)(iii); 40 C.F.R. § 122.44(d)(1)(vii)(B). To be clear, the phrase "reduce the discharge of pollutants" does not appear in the text of 40 C.F.R. § 122.44(d)(1)(vii)(B). But the effect of the regulation is the same. When a permitting authority ensures that effluent limits will be consistent with WLAs, permittees are subject to discharge requirements that in accordance with "the portion of a receiving water's loading capacity that is allocated to one of its existing or future point sources of pollution." 40 C.F.R. § 130.2(h).

[71] Under 33 U.S.C. § 1342(p)(3)(B)(iii), MS4s shall require "such other provisions" as "the State determines appropriate for the control of such pollutants." MDE (acting on behalf of the State) required the Counties to achieve the 20% restoration requirement.

### 1. Reduction of Pollutant Discharge

The Permits include two important components that inform our analysis of whether MDE's monitoring program ensures reductions in the discharge of pollutants: (a) the monitoring and modeling scheme and (b) adaptive management. As we explain, our initial discussion of monitoring and modeling is not sufficient to measure MDE's compliance with 40 C.F.R. § 122.44(i). Rather, it is a necessary component of what we consider a two-part scheme MDE designed to ensure the Counties would implement controls to reduce stormwater discharges.

### a. Monitoring and Modeling

MDE requires the Counties to implement a stormwater management program ("SWMP"), which consists of BMPs. Part IV.D.1.a. The Counties must integrate SWMPs with other permit requirements. Part IV.D. Aside from their role in the 20% restoration requirement, BMPs are most critical in the restoration plans that the Counties must implement to achieve progress in meeting WLAs. Part IV.E.2, 4; *see supra* note 17 (The WLAs are derived from the EPA approved TMDLs for each Permit.).

To achieve progress in meeting WLAs, the Counties must first set a baseline for stormwater pollutant loads. MDE, Guidance, at 3.[72] To set this baseline, the Counties must apply TMDL pollutant loading rates to urban land use data. *Id.* An MDE-approved model,

---

[72] As we have previously discussed with respect to the Montgomery County Permit, the Permit language is broad enough such that Montgomery County can rely on the Guidance in establishing pollutant loads. Montgomery County Permit Part III.J ("In order to accomplish these goals, this permit requires in Part III.J.2 below, that the County develop TMDL implementation plans that include estimates of pollutant loading reductions . . . .").

such as MAST, will automatically calculate the cost and load estimates for Counties to inform their decision-making. *See* About MAST, Maryland Assessment Scenario Tool, *available at* http://www.mastonline.org/About.aspx. The Counties can compare different scenarios to determine what BMPs they can implement to reduce pollution. *Id.*; *see also* MDE, Guidance, at 1 ("Local governments can weigh the cost associated with implementing different practices and choose the most efficient option for meeting pollutant load reductions."). The Counties select and begin implementing BMPs in accordance with their restoration plans. Part IV.E.2. Then they can monitor the effectiveness of the activities, Part IV.F.1.a.iv, and use the monitoring information to determine if the activities have helped make progress in achieving WLAs, Part IV.E.2, 4.

But the efficiencies for BMPs that the Counties select are based in part on estimates. *See, e.g.*, MDE, Guidance, at 10 (Table 4).[73] As our discussion of modeling illustrates, a

---

[73] MDE developed efficiencies in part based on the Maryland stormwater management eras in which approved BMPs were introduced. MDE, Guidance, at 6. BMPs have become increasingly sophisticated over time. *See* MDE, Guidance, at 10 (Table 4). MDE also derived efficiencies from the Chesapeake Bay Program ("CBP"), *see id.*, which explained inherent limitations in such efficiencies:

> It must also be recognized that the BMP efficiencies are being developed using an adaptive management approach that recognizes that our knowledge is incomplete. Adaptive management proposes a science-based and conservative approach to efficiencies. It allows a BMP efficiency review and updating at recurring intervals on the basis of new research, monitoring, and experience.

Chesapeake Bay Program, Phase 5.3 Community Watershed Model, § 6, at 6-9, *available at* http://www.chesapeakebay.net/about/programs/modeling/53/.

model predicts the reductions a BMP can achieve.[74] But it does not tell the Counties exactly what the BMP will do in terms of pollution reduction. Indeed, many variables impact this process.[75] *See* Chesapeake Bay Program, Phase 5.3 Community Watershed Model, § 6.1.2, at 6-4 ("Uncertainty in estimates of BMP effectiveness is due to factors including (1) variability in precipitation, hydrology, soils, and geology; (2) variable performance of land management practices; [and] (3) lag time between implementing a practice and full performance and observed water quality benefits . . . ."); *see also id.* at § 6.2.2, at 6-8 ("Virtually all research data are generated under controlled management conditions" that, among other things, are designed to minimize hazards; thus, "the research estimates are more representative of a best-case scenario.").

But this should not raise a red flag about the legal correctness of the Permits. Indeed, the inherent shortcoming in estimating BMP effectiveness explains MDE's decision to require the Counties to adapt their practices based on improved knowledge over time. *See*

---

[74] The modeling, which in many cases yields the WLAs the Counties are trying to meet, is itself a process of estimation and prediction. EPA, Bay TMDL § 5.3, at 5-19 ("The models produce estimates, not perfect forecasts. Hence, they reduce, but do not eliminate, uncertainty in environmental decision making."); *see also* EPA, Bay TMDL ES at ES-5 ("The TMDL is informed by a series of models . . . .").

[75] Research on BMP effectiveness suggests that it would be challenging to monitor practices through comparing data at multiple sites because of variables likely beyond the Counties' control. *See id.* at § 6.2.1, at 6-4 (Because "pollutant transport occurs through a variety of environmental pathways," transport time "varies substantially . . . . Surface runoff to a stream can take minutes to days, whereas leaching to groundwater followed by discharge to a stream can take months to decades."); *cf. Natural Res. Def. Council, Inc.*, 34 N.E.3d at 783 ("[A]lthough municipalities operate sewer systems, stormwater contamination results from the often unforeseen or unpredictable choices of individual residents and businesses (for examples, to let litter pile up or to use certain lawn fertilizers) . . . .").

*infra* Discussion: Adaptive Management. Rather, because the Counties *must* implement BMPs to make progress in achieving WLAs, estimation and prediction are necessary evils in this context. Thus, high quality assessments of BMPs are particularly important in the Permits so that MDE and the Counties can understand which practices are most effective to meet the many WLAs incorporated into the Permits. *See infra* note 17.

As we have discussed, MDE requires the Counties to assess BMPs through a focused monitoring approach. Part IV.F.1.a.iv. In the Basis for Final Determination, MDE explained that pollution reduction research supported the use of focused monitoring to better understand and, thus, improve BMPs. MDE, Basis for Final Determination to Issue Anne Arundel County's NPDES MS4 Permit (2013).[76] The research includes an analysis of how states, including Maryland, were "tracking nutrient and sediment control practices" to restore the Chesapeake Bay. *See* Committee on the Evaluation of Chesapeake Bay Program Implementation for Nutrient Reduction to Improve Water Quality, Achieving Nutrient and Sediment Reduction Goals in the Chesapeake Bay vii (National Academies Press 2011) [hereinafter Achieving Nutrient and Sediment Reduction Goals in the Bay]. The National Research Council ("NRC")[77] established a "multidisciplinary committee of

---

[76] In 2009, the EPA contacted the National Research Council ("NRC") about evaluating the Chesapeake Bay Program ("CBP"). Committee on the Evaluation of Chesapeake Bay Program Implementation for Nutrient Reduction to Improve Water Quality, Achieving Nutrient and Sediment Reduction Goals in the Chesapeake Bay viii (National Academies Press 2011) [hereinafter Achieving Nutrient and Sediment Reduction Goals in the Bay]. The CBP is a partnership to restore the Chesapeake Bay that began in the 1980s between the EPA and several jurisdictions including Maryland. *Id.* at viii.

[77] The NRC, established by the National Academy of Sciences, is "the principal operating agency of both the National Academy of Sciences and the National Academy of

experts to provide advice to the EPA, the six states in the Chesapeake Bay watershed," and "other interested parties." Achieving Nutrient and Sediment Reduction Goals in the Bay at viii.

Importantly, "[t]he EPA specifically directed the NRC to evaluate the tracking of best management practice implementation . . . ." *Id.* The NRC's appointed committee stated that "[t]argeted monitoring programs . . . would provide valuable data to refine BMP efficiency estimates . . . ." *Id.* at 5.[78]

Consistent with the NRC committee report, MDE's approach to monitoring requires the Counties to assess the effectiveness of BMPs. Part IV.F.1 ("Monitoring activities shall occur where the cumulative effects of watershed restoration activities can be assessed."). Indeed, MDE designed the second component of the monitoring program with the same purpose in mind: monitoring "for determining the effectiveness of stormwater management practices for stream channel protection." Part IV.F.2.

MDE then uses the monitoring data to calibrate its models. Part IV.F.1.a.iv ("Data collected shall be used to estimate annual and seasonal pollutant loads and reductions, and for the calibration of watershed assessment models."). That is, MDE's approach yields

---

Engineering in providing services to the government, the public, and the scientific engineering communities." *Id.* at iii.

[78] The Water Groups contend that the NRC's opinion "cannot override legally promulgated regulations." We do not disagree. Rather, as we have explained, MDE relies on this publication in support of its program of focused monitoring, which improves the quality of pollutant data during BMP implementation. *See* 40 C.F.R. § 122.48(b) (Monitoring must be "sufficient to yield data which are representative of the monitored activity.").

more accurate data on the efficacy of BMPs, which increases certainty for all interested parties in understanding what effects restoration activities will have on the State's waters. MDE, Guidance, at 1 ("The data gathered may be used to update and improve Maryland's stormwater management matrix of options for achieving water quality."). Our review of the first component in the Permits—the monitoring and modeling scheme—illustrates that it is necessary to ensure the Counties are implementing BMPs to the maximum extent practicable.

### b. Adaptive Management

In their annual report, the Counties must submit the pollutant load reductions determined through monitoring. Part V.A.2.g; *see also* Attachment A: Annual Report Databases (G).

The required measurement is pounds per year, which is consistent with the federal requirement that a discharger monitors "mass (or other measurement specified in the permit) for each pollutant" or "volume of effluent discharged from each outfall." 40 C.F.R. § 122.44(i)(1)(i)-(ii). As discussed above, these reductions pertain to the pollutants which the Counties must monitor. Part IV.1.a.iv; *see* Attachment A: Annual Report Databases (G) (The pollutants arise from the Bay TMDL and local TMDLs.).

MDE will review the annual reports, Part V.B, and will require program modifications "according to needed program improvements identified as a result of [MDE's] periodic evaluations," Part IV.D.[79] "Failure to comply with a [P]ermit

---

[79] *See also* Part V.A.3 ("Because this permit uses an iterative approach to implementation, the County must evaluate the effectiveness of its programs in each annual

provision," such as the stormwater management or reporting requirements, "constitutes a violation of the CWA and is grounds for enforcement action; permit termination, revocation, or modification; or denial of a permit renewal application." Part VII.C.

As we have discussed,[80] MDE has flexibility in setting controls in MS4s: "Congress did not mandate [in 33 U.S.C. § 1342(p)(3)(B)(iii)] a minimum standards approach or specify that the EPA develop minimal performance requirements." *Natural Res. Def. Council, Inc.*, 966 F.2d at 1308; *see also* 54 Fed. Reg. at 23,870, 23,879 (codified at 40 C.F.R. § 122.44) ("Subparagraph (vii) does not prescribe detailed procedures for developing water quality-based effluent limits. Rather, the regulation prescribes minimum requirements for developing water quality-based effluent limits, and at the same time, gives the permitting authority the flexibility to determine the appropriate procedures for developing water quality-based effluent limits."). We discern that the law requires a regulating authority such as MDE to review the entity's actions (or non-action, as the case may be) to ensure accountability in implementing stormwater controls: "stormwater management programs that are designed by regulated parties must, in every instance, be subject to meaningful review by an appropriate regulating entity to ensure that each such

---

report. BMP and program modifications shall be made within 12 months if the County's annual report does not demonstrate compliance with this permit . . . .").

[80] *See supra* Part I.A: Maximum Extent Practicable.

72

program reduces the discharge of pollutants to the maximum extent practicable." *EDC,* 344 F.3d at 856.[81]

MDE's adaptive management approach includes a requirement to impose program changes based on annual report data obtained from monitoring. Where, for example, the Counties' current strategy is not reducing discharges, the Permits allow MDE to force the Counties to implement BMPs that will, or at least are an improvement. Because the Counties will implement controls to reduce discharges under MDE's oversight, the monitoring provisions comply with 40 C.F.R. § 122.44(i).[82] *See Natural Res. Def. Council, Inc. v. Cnty. of L.A.*, 673 F.3d 880, 897 (9th Cir. 2011) ("As opposed to absolving noncompliance or exclusively adopting the MEP standard, the iterative process ensures

---

[81] The Ninth Circuit in *EDC* concluded that the EPA had implemented a rule that failed to comply with 33 U.S.C. § 1342(p). *See* 344 F.3d at 855 ("Nothing in the Phase II regulations requires that NPDES permitting authorities review these Minimum Measures to ensure that the measures that any given operator of a small MS4 has decided to undertake will *in fact* reduce discharges to the maximum extent practicable.") (emphasis in original).

[82] The New York State Department of Environmental Conservation ("DEC") designed a similar approach in its MS4 general permits, which the Court of Appeals of New York upheld in 2015:

> DEC's review of annual reports allows the Department to keep tabs on small MS4s and to require any necessary refinement of best management practices. DEC refers to these contemplated successive rounds of reviewing and, as necessary, fine-tuning and refocusing best management practices as the "iterative process" that is the hallmark of the flexible "maximum extent practicable" standard, which Congress deliberately chose as best suited for regulating small municipalities' stormwater discharges.

*Natural Res. Def. Council, Inc.*, 34 N.E.3d at 790.

73

that if water quality exceedances 'persist,' despite prior abatement efforts, a process will commence whereby a responsible Permittee amends its [stormwater quality management program]."), *rev'd on other grounds sub nom. L.A. Cnty. Flood Control Dist. v. Natural Res. Def. Council, Inc.*, 133 S. Ct. 710, 713 (2013); *cf. Port of Seattle v. Pollution Control Hearings Bd.*, 90 P.3d 659, 679 (Wash. 2004) (en banc) ("Monitoring and adaptive management provide a mechanism through which [the Washington State Department of Ecology] can mitigate [an] inherent uncertainty" in the question of whether there was a reasonable assurance that an airport runway project would not violate applicable water quality standards.); University of Maryland/Mid-Atlantic Water Program, BMP Assessment Final Report 25–26 (2009) ("Utilizing an adaptive management approach recognizes uncertainty and limitations in science, but does not impede implementation of management actions.").[83]

## 2. 20% Restoration Requirement

As to the second limitation, it is true that the Permits do not require monitoring of impervious surfaces in the section entitled "Assessment of Controls," which contains the focused monitoring requirements. *See* Part IV.F. But, as we explain, because (1) 40 C.F.R. § 122.44(i) contemplates a flexible approach to monitoring and (2) MDE incorporated a clear evaluation tool into the Permits to assess restoration of impervious surfaces, MDE has assured compliance with the 20% restoration requirement under 40 C.F.R. § 122.44(i).

---

[83] "The Mid-Atlantic Water Program (MAWP) housed at the University of Maryland (UMD) led a project to develop the components or subcategories of select BMPs and a corresponding definition(s) and effectiveness estimates." University of Maryland/Mid-Atlantic Water Program, BMP Assessment Final Report 5 (2009).

74

Under the restoration provision, MDE's approach requires the Counties first to submit an assessment of their impervious surface area within a year of the issuance of the Permits. Part IV.E.2.a. This Permit part incorporates by reference the Guidance, which contains the methodology we discuss herein. In the assessment, the Counties must delineate those portions in their jurisdictions "that are either treated to the [MEP], partially treated, or untreated and available for retrofit."[84] MDE, Guidance at III.4, at 4.

To ensure that the Counties implement satisfactory BMPs on their untreated surfaces, MDE requires the Counties to translate the activities into credits. *Id.* at IV, at 8. This credit system is tethered to the performance standard through which MDE determined which BMPs are satisfactory: the $WQ_v$. *Id.* "An acre for acre impervious credit will be given when a structural BMP is specifically designed to provide treatment for the full $WQ_v$ (one inch), or [a] proportional acreage of credit will be given when less than the $WQ_v$ is provided." *Id.* Moreover, for BMPs that "provide greater than one inch of volume control," the activities "receive additional credit." *Id.*[85]

---

[84] We have already discussed and approved of MDE's decision to require the Counties to use 2002 as the baseline for determining those impervious surfaces controlled to the MEP. *See supra* Part I.C: The Methodology in the Guidance.

[85] As MDE explained in the Basis for Final Determination, "the Guidance clearly shows that ESD practices will be given greater pollutant load reductions than other acceptable water quality treatment practices." *See* MDE, Basis for Final Determination to Issue Anne Arundel County NPDES Permit. By way of example, the pollution reduction rate for total suspended sediment (TSS) for the $WQ_v$ standard is 80%. MDE established the pollution reduction rate for TSS for a rain garden at 90% and established the rate for the same pollutant for a dry detention pond at 10%. MDE, Guidance, at 10 (Table 4).

Because the Counties must adhere to the credit system, MDE can evaluate the jurisdictions' performances uniformly. The Guidance "standardizes procedures for the reporting of traditional, new, and alternative [BMPs] and the impervious area they control." MDE, Guidance at 1; *id.* ("By developing a comprehensive matrix of practices and consistent accounting measures, [MDE] brings greater certainty to the local planning and budgeting process."). This accounting system is also flexible enough to accommodate more non-traditional activities for which restoration credits are still available. *See* MDE, Guidance at V, at 11 ("This section presents alternative BMPs that will give jurisdictions greater flexibility toward meeting stormwater permit requirements.").

Moreover, the Counties must report annually on their progress in achieving the 20% restoration requirement. Part V.A.1.a.ix.[86] Failure to comply with these requirements—submission of the impervious surface area assessment; implementation of restoration practices on impervious surfaces not controlled to the MEP; and submission of reports on the Counties' activities according to the credit system—is a violation of the CWA and grounds for agency action. Part VII.C.

We find instructive the Second Circuit's reasoning in upholding, in part, the EPA's monitoring provisions in permits to regulate the discharge of ballast water from ships. *Natural Res. Def. Council, Inc.*, 808 F.3d at 562.[87] As to certain effluent limitations in

---

[86] The Counties must submit annual databases for BMP locations and impervious surface area to document progress toward the 20% restoration requirement. Part IV.A.2.b-c; Attachment A: Annual Report Databases.

[87] "A ship takes on and discharges ballast water to compensate for changes in its weight caused by activities such as loading and unloading cargo or consuming fuel or

76

these permits,[88] the EPA required the monitoring of "functionality" of a vessel's ballast water treatment system, and of the concentrations of two specific bacteria. *Id.* at 581.[89] The EPA did not, however, require vessel owners "to take any measurement of pollutants or significant categories of living organisms in ballast water being discharged." *Id.*

Although environmental organizations argued that the EPA should have required monitoring of the concentrations of living organisms, the Second Circuit concluded that the EPA's provisions complied with 40 C.F.R. § 122.44(i). *Id.* at 582–83. Because the regulation sanctioned the monitoring of some "other measurement specified in the permit," the functionality and indicator organism monitoring "qualif[ied] as such 'other measurement.'" *Id.* at 582. Although the environmental organizations had advocated for the alternative of "direct monitoring," the Second Circuit reasoned that dischargers did not have the capacity to quantify living organisms of certain size classes. *Id.* Moreover, the current technology would require an analysis that was "prohibitively expensive and

---

supplies." *Natural Res. Def. Council, Inc. v. EPA*, 808 F.3d 556, 561 (2d Cir. 2015). During this process, a ship can collect organisms, then discharge them somewhere else, thereby "enabling these organisms to establish new, non-native populations. As a result, ships have become one of the primary ways that invasive species are spread from one waterbody to another." *Id.*

[88] The specific limitations to which the relevant monitoring provisions in *NRDC* were applicable restricted the discharges of organisms and of pathogen and pathogen indicators. *Id.* at 567.

[89] Functionality monitoring required a ship owner to measure something to assess system functionality, "such as how much chlorine the system is using each month." *Id.* at 581. Indicator organism monitoring required the owner to analyze samples of ballast discharge to determine whether the sample contained "significant levels" of the bacteria. *Id.*

impractical." *Id.* There was, in essence, no "feasible" alternative the EPA could have established under these permits. *Id.* at 582–83. Thus, the Second Circuit deferred to the EPA's decision. *Id.* at 583.

From *NRDC*, we discern that a permitting authority has *flexibility* in how it sets monitoring requirements. As 40 C.F.R. § 122.44(i) reveals, the EPA wrote the regulation with the understanding that not every permit limitation could be measured in terms of mass or volume. *See* 40 C.F.R. § 122.44(i)(1)(i) (The regulation requires monitoring of mass "or other measurement specified in the permit."). In this case, those measurements would not aid the Counties or MDE in evaluating progress toward restoring impervious surface *area*. Rather, MDE requires the translation of restoration practices, implemented on impervious surface areas, into credits to make restoration of those areas understandable. The agency can also monitor restoration in a uniform manner.

From *NRDC*, we also discern that 40 C.F.R. § 122.44(i)(1)(i) requires *feasible* monitoring. Here, the Guidance not only promotes accountability in a uniform manner but also gives MS4 permittees the flexibility to choose from among approved restoration practices to address local conditions. Flexibility is a hallmark in designing MS4 permits. *See* 55 Fed. Reg. at 48,038 ("In enacting section 405 of the [Water Quality Act], Congress recognized that permit requirements for [MS4s] should be developed in a flexible manner to allow site-specific permit conditions to reflect the wide range of impacts that can be associated with these discharges."). The Water Groups have not presented a feasible alternative that contains both the flexibility and the accountability to assure compliance with the permit limitation that Counties restore 20% of their impervious surface areas.

78

MDE has complied with 40 C.F.R. § 122.44(i) by incorporating the Guidance by reference for the Counties to use to meet the 20% restoration requirement.

We recognize that MDE did not incorporate the Guidance into the Montgomery County Permit. But that fact is not fatal to that Permit's ability to comply with 40 C.F.R. § 122.44(i). When the County submits its annual report, the County must include databases of impervious acreage and specify those areas treated by BMPs, proposed for restoration, under construction for restoration, and completed. Montgomery County Permit Part IV:A.2, Attachment A: (C). The County must also submit descriptions of the type of BMP it used at specific locations. *Id.* at Part IV:A.2, Attachment A: (D). As we have discussed, those BMPs are the stormwater practices in the Manual. These reporting requirements will allow MDE to evaluate on a yearly basis the Counties' compliance with the 20% restoration requirement. We recognize that this reporting system is not as detailed as the method in the Guidance, but 40 C.F.R. § 122.44(i) does not include requirements as to the specificity of the measurement the permitting authority selects. *See, e.g., Natural Res. Def. Council, Inc.*, 808 F.3d at 581 (As to monitoring of a vessel's ballast water treatment system, the EPA required ship owners to measure system functionality, "such as how much chlorine the system is using each month.").

The Permit also states that the County must merely describe "the results and analysis of data." Part IV.A.1.b. Because the Permit does not prohibit the type of analysis that the County may use to evaluate the 20% restoration requirement, we conclude that the County may use the Guidance. Thus, we conclude that the Montgomery County Permit complies with 40 C.F.R. § 122.44(i) too.

## Part IV: Public Participation

"Many tensions exist between the democratic aspiration of government of the people, by the people, and for the people and modern representative government with its mass electorate and elaborate bureaucracy for carrying out government functions. Nowhere are these tensions more acute than in the domain of environmental policy." National Research Council, Public Participation in Environmental Assessment and Decision, National Academies Press 7 (2008). The dispute between the Water Groups and MDE over whether the Permits satisfy public participation requirements exemplifies this tension. The Water Groups frame their argument by highlighting the ways in which the Permits' two most critical elements—the TMDL Plans and the 20% restoration requirement—fail to satisfy public participation requirements.

### A. TMDL Plans

We have discussed at length that the Permits require the Counties to submit TMDL plans and that, among other things, the Permits satisfy 40 C.F.R. § 122.44(d)(1)(vii)(B), which requires that effluent limits be consistent with WLAs.

Nevertheless, the Water Groups contend that the TMDL plans create another problem. The Permits require the Counties to design and submit these plans *after* the agency approves of the Permits. *See, e.g.*, Montgomery County Permit Part III.J.2 ("Within one year of the effective date of this permit or the approval of an applicable TMDL by EPA, whichever is later, the County shall submit to MDE for review and approval a TMDL implementation plan . . . ."). The Water Groups contend that MDE has "unlawfully circumvent[ed]" federal and state procedural requirements because the restoration plans,

which include significant new requirements, come into existence more than one year after the Permits are issued, without providing for public notice and comment.[90] The Water Groups characterize this scheme as an "end-run around mandatory permitting requirements" and as an approach that "thwart[s] accountability." Put simply, the essence of the Water Groups' argument is that the public cannot comment about decisions that have yet to be made.

## 1. Permit Modification

Specifically, the Water Groups view the TMDL plans that must be submitted to MDE as a modification of the Permits. Federal and state regulations stipulate that a permitting authority must provide the public an opportunity to be heard prior to a modification of a permit authorizing discharges. 40 C.F.R. §§ 122.62, 124.10; EN §§ 1-601, 9-324.[91] Courts across the country have cited these federal regulations as well as related state regulations in recognizing the necessity of public participation when a permit has been modified. *See, e.g., United States v. Smithfield Foods*, 191 F.3d 516 (4th Cir. 1999); *Citizens for a Better Env't—California v. Union Oil Co. of California*, 83 F.3d 1111 (9th Cir. 1996). Thus, the Water Groups' argument requires us to determine whether the restoration plans constitute a

---

[90] It is, however, undisputed that MDE provided the public with an opportunity to comment on the reissuance of the Permits.

[91] A permitting authority need not engage in public notice and comment procedures for "minor modifications" of a permit. 40 C.F.R. §§ 122.62, 122.63. The restoration plans, however, do not fall within the specific, enumerated list of revisions that constitute a minor modification under 40 C.F.R. § 122.63. Accordingly, the only issue here is whether the TMDL plans are a non-minor modification of the Permits.

81

modification of the Permits triggering an obligation upon MDE to implement the public participation provisions in those regulations.

The Permits direct the Counties to develop restoration plans using BMPs that are found in the Manual and discussed again in the Guidance. These documents, which MDE incorporated into the Permits by reference, provide a "menu of options" for the Counties to utilize. By incorporating these documents, MDE made the BMPs available to the Counties at the time the agency issued the Permits. When the Counties submitted (or will submit) restoration plans using these BMPs, no modification will have occurred because the Counties will merely have drawn from the same pool of BMPs that the agency had previously analyzed and approved of for *restoration* purposes. CWP & MDE, Manual § 2.0 ("This chapter also presents a list of acceptable BMP options that can be used to comply with the sizing criteria," including, the $WQ_v$.); *see* 27 Md. Reg. at 1168 (to be codified at COMAR 26.07.02) (MDE incorporated the Manual as part of the agency's effort to enhance its regulations which had until then provided "sparse guidance" on "water quality enhancement."). Although we recognize that the Counties have selected *specific* BMPs to implement from among a larger group of BMPs, the larger group still satisfies MDE's specific performance standard, $WQ_v$. Thus, no "material and substantial alterations or additions" will occur after Permit issuance "justify[ing] the application of [] conditions that are different or absent in the existing [P]ermit." 40 C.F.R. § 122.62(a)(1).

### 2. Opportunity to Comment

The Water Groups also argue that the restoration plans violate federal and state laws on public notice and comment because they are unable to meaningfully comment about

82

decisions that have yet to be made. This argument is unavailing because, as we have explained, the BMPs were previously able for the public to comment on. Indeed, many of the same Water Groups challenging the Permits in this case submitted comments on these BMPs.

For example, in the Basis for Final Determination, MDE noted that it "received many, varied and often conflicting comments regarding the Guidance," which referred to the BMPs, and that the Guidance was "widely distributed and commented on." One salient BMP that was objected to by some Water Groups was the use of detention facilities, such as detention ponds.[92] For example, Natural Resources Defense Council submitted a comment in which they criticized the Guidance as "flawed" because it "overestimate[d] the efficacy of detention ponds" and "overstate[d] the channel protection benefits of detention practices." Chesapeake Bay Foundation, also a party, commented that detention systems "provid[e] very little water quality benefits."[93]

On the other hand, the Water Groups strongly supported the use of ESD in their submitted comments.[94] Natural Resources Defense Council proffered that the draft

_____

[92] The Guidance classifies detention facilities as a "structural" BMP.

[93] The Natural Resources Defense Council, Anacostia Riverkeeper, Maryland Sierra Club, and Potomac Riverkeeper also commented on street sweeping and catch basin cleaning, which are deemed "alternative BMPs" by the Guidance. The Water Groups maintained that these practices were "not the best practices for restoring [] County water bodies."

[94] ESD is another type of BMP which includes green roofs, reinforced turf, dry wells, rain gardens, submerged gravel wetlands, permeable pavements, and other "green infrastructure" BMPs. Nancy Stoner, Acting Assistant Administrator, EPA Office of Water, & Cynthia Giles, Assistant Administrator, EPA Office of Enforcement and

83

Guidance "ignore[d] the Maryland statute establishing ESD as the preferred Maryland approach."[95] The Chesapeake Bay Foundation stated that the Permits "should impose a higher performance standard" and recommended that this "be done primarily through Environmental Site Design."[96] In its Basis for Final Determination, MDE responded to the Water Groups' comments by highlighting its credit approach to improving water quality. MDE explicated that the Guidance incentivized the utilization of ESD practices by granting greater pollution credit for ESD and less credit for structural treatment BMPs such as detention facilities. Furthermore, MDE justified the use of detention ponds and other types of structural BMPs pursuant to the Manual to afford the Counties the "flexibility to implement various strategies based on site specific opportunities." The comments and MDE's substantive responses thereto, illustrate that there was a vigorous and pellucid public discussion regarding the practices set forth in the Manual and Guidance, and that

---

Compliance Assurance, *Protecting Water Quality with Green Infrastructure in EPA Water Permitting and Enforcement Programs* (Apr. 20, 2011).

[95] These Water Groups also favored the use of the following BMPs: street sweeping, catch basin cleaning, erosion and sediment control, and storm drain vacuuming. However, they noted that these practices should "not be credited toward restoration or retrofit obligations" because "they do not reduce runoff volume."

[96] Likewise, the Natural Resources Defense Council, Anacostia Riverkeeper, Maryland Sierra Club, and Potomac Riverkeeper endorsed the use of ESD in comments they submitted to MDE. These Water Groups disapproved of the draft Permits because they did "not require or prioritize the use of environmental site design [] techniques" and allowed the Counties "to meet its 'restoration requirement' through the use of non-ESD practices."

the agency defended its approach to water improvement strategies as flexible but effective.[97]

Thus, the record in this case clearly supports that the public had the opportunity and, in fact, actually commented on which BMPs would best meet the MEP standard for restoration purposes.[98] In arguing that they cannot comment about decisions that have yet to be made, the Water Groups overlook the fact that the public was able to comment on BMPs—the core component of the TMDL restoration plans.

Moreover, even though the Counties create the restoration plans after the Permits are approved, the public is still able to participate in the formulation of the plans. The Permits explicitly provide for "[a] minimum 30 day comment period" before finalization of the restoration plans. In addition, the Counties must give notice in a local newspaper and on their website outlining how the public may obtain information and provide comments on the restoration plans. Critically, the Counties must also include a summary in their annual reports of how they "addressed or will address any material public comments received." MDE reviews these reports. The Counties are "responsible for complying with all conditions of" the Permits, and "[f]ailure to comply with a [P]ermit provision constitutes a violation of the CWA and is grounds for enforcement action." Thus,

---

[97] In addition to the opportunity to provide written comments on the draft Permits, MDE held public hearings to accept formal testimony on each Permit.

[98] We recognize that these public comments on the BMPs did not appear during the development of the Montgomery County Permit. Nevertheless, the Manual, from which the BMPs arise, was publicly available. It is the BMPs that are the actions the Counties will take to make progress toward WLAs.

contrary to the Water Groups' assertion that the Permits "thwart accountability," the Permits afford the opportunity for robust public involvement in the attempt to abate stormwater pollution and improve water quality.

That the Permits provide for public participation at the County level is not enough for the Water Groups. The Water Groups fault the Permits for not providing for public participation at the state level and proffer that the Permits "prevent[] members of the public from commenting on . . . MDE's decision to approve the restoration plans." Because the public had the opportunity to comment on the "menu" of BMPs in the Manual and the Permits unambiguously mandate public participation at the County level, the restoration plans have been subject to a "double layer" of public participation. We, therefore, are not persuaded by the Water Groups' arguments.

Finally, the Water Groups maintain that MDE's claims of "potential administrative burdens are irrelevant and specious." We must, however, give weight to the notion that MDE permitted the Counties to draw from a broad group of BMPs in the Manual in light of the highly variable nature of stormwater discharges. MDE possesses a comparative advantage in addressing environmental problems affecting our State. It is axiomatic that a reviewing court should respect "the expertise of an agency in its own field." *Banks*, 354 at 69, 729 A.2d at 381 (citations omitted). Moreover, the Counties have expertise in water quality assessments of waterbodies found within the boundaries of their political subdivisions. As the Permits require, the Counties "shall complete detailed watershed assessments" for their entire jurisdiction. Thus, there is great value in deferring to the Counties' choice of BMPs, and because the public had an opportunity to comment on the

86

BMPs during the drafting of the Permits as well as on the select BMPs in the restoration plans the Counties submit to MDE, we conclude that the public has not been deprived of notice and comment.

### 3. Case Law

The Seventh Circuit's decision in *Texas Independent Producers and Royalty Owners Assoc. v. EPA*, 410 F.3d 964 (7th Cir. 2005), is also instructive on this point. In *Texas Independent Producers*, the EPA issued a general permit for stormwater discharges from construction sites that required operators to file a Notice of Intent ("NOI") stating that they planned to operate under the general permit, rather than apply for an individual permit. 410 F.3d at 968. Absent a negative ruling by the EPA, stormwater discharges that complied with the terms of the general permit were automatically authorized. *Id.* The permit also required that operators "create, maintain, and implement a site-specific Storm Water Pollution Prevention Plan ("SWPPP")." *Id.* An environmental organization challenged the Permit and asserted that it violated the Clean Water Act because it failed to satisfy public participation requirements regarding the NOI and SWPPP.

After conducting a *Chevron* analysis, the court concluded that EPA's reasoning as to why it issued the general permit without providing for public review of NOIs and SWPPPs was "eminently reasonable." *Id.* at 978. Notably, the court accepted EPA's argument that because the public had the opportunity to comment on the proposed general permits whose terms governed the NOIs and SWPPPs, there was "no need for additional public comment or a notice period [regarding NOIs and SWPPPs themselves]." *Id.* In addition, the court credited the EPA's contention "that requiring 'an additional public

hearing on each individual NOI and SWPPP would eviscerate the administrative efficiency inherent in the general permitting concept,' in effect making the general permit scheme no different from the process of obtaining individual permits." *Id.*

The Water Groups point out that the permit in *Texas Independent Producers* was a general permit whereas the Permits at issue here are "not eligible for general permits." The Water Groups rightly note that the "existence of different permitting regimes for large and small municipal storm sewer systems reflects Congressional policy judgment" that large MS4s be regulated differently than small systems. Even if the permits are not the same, the Permits at issue in this case are conceptually analogous to a general permit because all Counties create their restoration plans based upon the *same* document setting forth the *same* groups of BMPs—the Manual. Accordingly, we find the Seventh Circuit's determination regarding public participation in *Texas Independent Producers* persuasive, and conclude that the Permits' TMDL planning requirement does not violate notice and comment mandates.

The Water Groups rely on the Second Circuit's decision in *Waterkeeper Alliance, Inc. v. EPA*, 399 F.3d 486 (2d Cir. 2005), in support of their argument that the contents of the TMDL plans are subject to public participation requirements. In *Waterkeeper Alliance*, the court examined the regulation of water pollutants contained in the runoff from concentrated animal feeding operations ("CAFOs"). In pertinent part, the court held that the nutrient management plans the CAFOs were required to develop were effluent limits but that the EPA violated public participation requirements because it "fail[ed] to require that the terms of the nutrient management plans be included in the NPDES

permits." *Waterkeeper Alliance*, 399 F.3d at 502–04. The court stated that the plans were effluent limits because the CAFOs were required to set waste application rates in the plans. *Id.* at 502; *see* 33 U.S.C. § 1362(11) (An effluent limit includes a restriction on a rate.). In contrast to the nutritional plans discussed in *Waterkeeper Alliance*, the most critical element of the restoration plans—the BMPs—is already included in the Permits because the Permits incorporate the Manual and Guidance, which set forth those practices. Thus, the Water Groups' reliance on *Waterkeeper Alliance* is misplaced. *See* Part III.G, Part IV.E.2.a.

A Ninth Circuit decision addressing public participation is also distinguishable. In *Environmental Defense Center v. EPA*, the Ninth Circuit remanded an EPA regulation that required operators of MS4s to develop and implement individualized pollution control programs that were not subject to agency review or public participation. 344 F.3d at 853–58. The court found that the rule violated 33 U.S.C. § 1342(p)(3)(B)(iii), which is the same statutory provision that is at the center of this case. The court held that MS4 pollution control programs must be reviewed by the permitting agency and were subject to public comment, in part because those permittee-prepared programs—not the general permits issued to MS4 operators—would contain the substantive requirements that operators must implement to reduce discharges to the "maximum extent practicable." *Id.* at 855, 857.

Here, the Counties must submit restoration plans derived from **specified** best management practices, including ponds, wetlands, infiltration practices, filtering systems, open channels, and other structural water quality practices, that were previously available for public comment. In contrast to the specific practices that form the basis of the

restoration plans in the Permits, all that was available at the time of permit issuance in *Environmental Defense Center* were "six *general* criteria" designed to protect water quality that were never reviewed by the public. *Id.* at 845, 853 (emphasis added).[99] Consequently, the court's holding in *Environmental Defense Center* rested, at least in part, on facts that are distinguishable from the circumstances in this case.

### 4. Incorporation By Reference And Deference

To be sure, the Permits rely heavily on incorporation by reference. But such incorporation by reference, even of important documents, does not contravene public participation requirements because the Manual and Guidance are readily accessible to the public. *Cf.* Proposed Action on Regulations, 35:25 Md. Reg. 2193 (Dec. 5, 2008) ("Pursuant to State Government Article § 7-207, Annotated Code of Maryland, the 2000 Maryland Stormwater Design Manual . . . has been declared a document generally available to the public and appropriate for incorporation by reference. For this reason, it

---

[99] The six general criteria were:

    (1) conducting public education and outreach on stormwater impacts;
    (2) engaging public participation in the development of stormwater management programs;
    (3) detecting and eliminating illicit discharges to the MS4;
    (4) reducing pollution to the MS4 from construction activities disturbing one acre or more;
    (5) minimizing water quality impacts from development and redevelopment activities that disturb one acre or more; and
    (6) preventing or reducing pollutant runoff from municipal activities.

will not be printed in the Maryland Register or [COMAR].").[100]  Additionally, including

the best management practices in the Permits would significantly lengthen the document,

which would obfuscate other requirements in the Permit.  The Manual has also been part

of Maryland regulatory law for two decades.  It is so entrenched in the permitting process

that we see no reason to detail the content of the Manual in the Permits.

### 5.  Compliance Schedules

The Water Groups further argue that MDE must formally incorporate the restoration

plans through modification procedures because the plans contain compliance schedules.

They allege that compliance schedules are effluent limitations under the CWA, *see* 33 U.S.C.

§ 1362(11), (17), and they must be "included in a 'permit,'" 40 C.F.R. § 122.2.  Ergo, MDE

must formally incorporate the Counties' restoration plans—containing the compliance

schedules—after the Counties submit their plans to MDE.  The problem, however, is that

the Water Groups do not explain why the schedules in the restoration plans constitute

compliance schedules.

The Permits state that the Counties must include in their restoration plans "the final

date for meeting applicable WLAs and a detailed schedule for implementing all structural

and nonstructural water quality projects, enhanced stormwater management programs, and

alternative stormwater control initiatives necessary for meeting applicable WLAs."  Part

IV.E.2.b.i.  Quite obviously, the restoration plans contain schedules.  *Id.*  But a schedule of

---

[100] Indeed, the Manual can be found through a quick Internet search and is available on MDE's website: http://www.mde.state.md.us/programs/water/stormwater managementprogram/marylandstormwaterdesignmanual/Pages/Programs/WaterPrograms/SedimentandStormwater/stormwater_design/index.aspx.

compliance, which is an effluent limitation, is "any restriction *established by a State*." 33

U.S.C. § 1362(11) (emphasis added); *see In re Alexandria Lake Area Sanitary Dist.*

*NPDES/SDS Permit No. MN0040738*, 763 N.W.2d 303, 318 (Minn. 2009) (holding that

even though the TMDL was not yet complete, a schedule of compliance existed where the

*state pollution control agency required* a facility "to meet an effluent limit set upon

completion of the TMDL process"). Here, however, the schedule in the restoration plan is

set by the *Counties*. States are not required to set compliance schedules, 40 C.F.R. § 122.47,

and MDE has not exercised its discretion to do so.

We recognize that a schedule of compliance is "an enforceable sequence of actions

or operations leading to compliance with an effluent limitation, other limitation,

prohibition, or standard." 33 U.S.C. § 1362(17). But the "detailed schedule" the Counties

must set is subject to change. The Counties may substitute activities where the initially

scheduled projects are not making progress in achieving WLAs. Part IV.E.2.b.iv.

Consequently, the County-set schedules in the restoration plans are not "enforceable"

sequences of actions or operations. What forces the Counties to comply with the WLAs is

the annual reporting requirement, which explains that "BMP and program modifications

shall be made within 12 months if the [Counties'] annual report[s] do[] not . . . show

progress toward meeting WLAs developed under EPA approved TMDLs." Part V.A.3.

As we have discussed,[101] this adaptive management approach is the true enforcement

mechanism that "lead[s] to compliance with an effluent limitation [or] other limitation."

---

[101] *See Supra* Part III.E.1.b: Adaptive Management.

33 U.S.C. § 1362(17). Thus, we conclude that the nature of the schedules in the restoration plans does not require MDE to incorporate those plans into the Permits by modification.[102]

## B. 20% Restoration Requirement

The second key component of the Permits that the Water Groups focus on is the 20% restoration requirement.[103] This part of the Permits requires the Counties to complete restoration efforts for 20% of the Counties' impervious surface area that is not restored to the maximum extent practicable. Part III.G.2; Part IV.E.2.a. Although not required to do so, *see* 33 U.S.C. 1342(p), MDE decided to impose this numeric effluent limitation.[104]

The Water Groups allege that this provision "is not specific, measurable, or enforceable." Thus, they argue, MDE has created a requirement that the Water Groups cannot comment on or seek judicial review of.

---

[102] Because we disagree with the Water Groups' arguments, the TMDL plans are not "enforceable" such that MDE has violated public participation laws. Rather, the TMDL plans are "enforceable" insofar as the Counties are required to submit them to MDE and MDE will monitor the Counties' implementation of the TMDL plans through the reporting requirements in the Permits.

[103] The Water Groups mischaracterize the 20% restoration requirement as a "plan" and thus discuss it in the same context that they discuss how the TMDL plans violate public participation requirements. This description is inaccurate because, quite simply, there is no plan for the 20% restoration requirement. Rather, the Counties need only restore 20% of their impervious surface area within five years. Part III.G.2. Consequently, the Water Groups' argument that MDE's approval of TMDL plans constitutes a modification with respect to the 20% requirement is inapposite.

[104] As we have previously discussed, MDE's decision to impose this restoration requirement on the Counties was supported by substantial evidence and was not arbitrary and capricious. *See supra* Part I.B: Substantial Evidence and Arbitrary and Capricious.

Because of our earlier analysis, in part, the Water Groups' arguments are unavailing. Restoration is not "undefined" as the Water Groups argue because MDE anchored restoration in the universe of practices in the Manual. *See* Part III.E.1 ("At a minimum, the County shall . . . [i]mplement the stormwater management . . . practices found in the [Manual] . . . .").[105]  Although the Water Groups do not know in advance which specific practices the Counties will select to restore their impervious surfaces, MDE has permitted the Counties to select from among practices that satisfied a specific performance standard, WQ$_v$.  CWP & MDE, Manual § 1.2 (General Performance Standards for Stormwater Management in Maryland).

Moreover, it is inaccurate for the Water Groups to allege that MDE can approve activities "that are *known* to be ineffectual without ever being required to articulate its rationale for doing so, or being held accountable."  MDE articulated a response to the Water Groups' criticism of detention practices: "Maryland's Manual for stormwater BMP design and MDE's approach to retrofitting under the municipal permit program are completely aligned with the National Research Council report [stating that detention ponds fail to meet the full range of urban stream and watershed restoration objectives]."  MDE, Basis for Final Determination to Issue NPDES Permit.  MDE has responded to comments adverse to the draft permit in accordance with Maryland law and its response is adequate.  *See* EN § 1-604(b) ("The Department shall prepare a final determination if" the Department received comments adverse to the tentative determination.).  Thus, MDE's approach has

---

[105] *See supra* Part I.A: Maximum Extent Practicable.

94

not shielded its decision to approve the Counties' restoration efforts from comment or judicial review.

The Water Groups criticize MDE's use of the Guidance because, in their view, the Guidance provides assumptions about stormwater practices rather than an enforceable standard. According to the Water Groups, MDE could not know whether the Counties' efforts would be adequate when it issued the Permits because "whether the chosen practices actually meet these [pollution reduction] expectations depends entirely on the details of a permittee's restoration plans."

This argument, however, must fail because it overlooks the nature of the 20% restoration requirement: a surrogate. ENSR, Pilot TMDL Applications Using the Impervious Cover Method § 1.0, at 1-1 ("The IC [Impervious Cover] method uses percent impervious cover in a watershed as a surrogate TMDL target.").[106] Because the 20% restoration requirement is a surrogate for reducing pollution, MDE has logically created an accountability system based on an assessment of compliance *with the surrogate*, not on assessment of pollution reduction in fact.[107] *See* 33 U.S.C. § 1342(p)(3)(B)(iii) (This law

---

[106] There is no allegation that MDE has failed to follow the impervious cover method in designing the 20% restoration requirement. In fact, attorneys representing the Water Groups recognized MDE's adherence to this model when MDE was drafting the Permits. University of Maryland Environmental Law Clinic, Comments on the Tentative Determination to Issue the NPDES MS4 Permit to Montgomery County at 9 & n.26 (2008) ("The watershed restoration approach advanced by the Draft Permits comports with the impervious cover method ("ICM"). ICM involves reducing impervious cover to a target percentage as a 'surrogate TMDL target.'").

[107] The Water Groups also overlook that, before the EPA issued the Bay TMDL, Maryland "reasonably assured" the EPA that it would achieve the necessary pollution reductions to restore the Chesapeake Bay. Maryland's strategy included the 20%

requires "controls to reduce the discharge of pollutants" to the MEP, not "reductions to the MEP."); *EDC*, 344 F.3d at 855 (The permitting authority must "review these Minimum Measures to ensure that the measures that any given operator of a small MS4 has decided to undertake will *in fact* reduce discharges to the maximum extent practicable.") (emphasis in original).

To ensure that the 20% requirement is met, MDE requires the Counties to translate the BMPs they implement on impervious surfaces into credits. As we previously explained, the credit system is related to the performance standard in the Manual: the $WQ_v$. "An acre for acre impervious credit will be given when a structural BMP is specifically designed to provide treatment for the full $WQ_v$ (one inch), or [a] proportional acreage of credit will be given when less than the $WQ_v$ is provided." Moreover, for BMPs that "provide greater than one inch of volume control," the activities "receive additional credit."[108] As a result, the Counties must choose the appropriate mix of BMPs to obtain enough credits to satisfy the 20% requirement. If the Counties ignore the credit system

restoration requirement. *See supra* Part I.B: Substantial Evidence and Arbitrary and Capricious.

     Our prior discussion of monitoring and modeling also renders the Water Groups' criticism of the efficiency estimates in the Guidance inapposite. *See, e.g.*, Chesapeake Bay Program, Phase 5.3 Community Watershed Model, § 6, at 6-9 ("It must also be recognized that the BMP efficiencies are being developed using an adaptive management approach that recognizes that our knowledge is incomplete."). As we have discussed, MDE's use of monitoring and the adaptive management approach ensures that the Counties will implement BMPs to reduce discharges in compliance with the MEP standard. *See supra* Part III.E.1: Reduction of Pollutant Discharge.

     [108] Undoubtedly, if the Counties choose BMPs with efficiency estimates above the $WQ_v$ standard, such as infiltration practices and ESD, they will comply with the 20% restoration requirement.

and the consequences of selecting BMPs with efficiency estimates below the WQ$_v$ standard, then the Counties risk failing to fulfill the 20% restoration requirement and confronting an enforcement action by MDE. Part VI.C. The Counties **must** complete restoration efforts for 20% of their impervious surface area within five years under the express terms of the permit according to the credit system we have explained. The 20% restoration requirement is thus also measurable and enforceable.[109] *See also* EPA, 2014 Memo at 10 (Box 1: Examples of WQBELs in MS4 Permits) ("The MS4 Permit includes a specific, quantifiable performance requirement that must be achieved within a set timeframe. For example: Restore within the 5-year permit term 20 percent of the previously developed impervious land (2014 Prince George's County, MD MS4 permit).").

### CONCLUSION

Upholding MDE's decision to issue the Permits, we are guided first and foremost by the law. That law, 33 U.S.C. § 1342, provides a flexible approach to MS4 permitting. Moreover, this approach contemplates that states shall set controls *they deem necessary* to reduce the discharge of pollutants into their waters. *See* 33 U.S.C. § 1342(p)(3)(B)(iii). The Water Groups insist that the Permits may not contain effluent limitations "to allow maximum flexibility." But even the EPA, to whom Congress delegated authority to issue

---

[109] As we discussed, we recognize that MDE did not incorporate the Guidance into the Montgomery County Permit. But this Permit allows MDE to measure the County's progress and ultimate compliance through the annual reporting requirement. Montgomery County Permit Part IV:A.2, Attachment A: (C, D). *See supra* Part III.E.2: 20% Restoration Requirement.

regulations pertaining to TMDLs, has afforded permitting agencies such as MDE the flexibility to develop effluent limitations. *See* 40 C.F.R. § 122.44(d)(1)(vii)(B).

We recognize that the CWA sets forth an important goal of public participation in the "development, revision, and enforcement" of these Permits. 33 U.S.C. § 1251(e). In our consideration of (1) the opportunity to comment in writing and at a public hearing on the draft Permits, (2) MDE's responses to the public's comments, and (3) the opportunity for the public to participate further in the Counties' efforts to meet WLAs, MDE has upheld its part of the bargain. That is, the agency has "provided for, encouraged, and assisted" public participation as Congress envisioned. 33 U.S.C. § 1251(e). Therefore, we conclude that MDE's decision was lawful and that the Permits are valid.

**IN CASE NO. 42, JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT WITH DIRECTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AND AFFIRM MDE'S DECISION TO ISSUE THE MONTGOMERY COUNTY PERMIT. COSTS TO BE PAID BY RESPONDENT.**

**IN CASE NOS. 43 & 44, JUDGMENTS OF THE CIRCUIT COURTS FOR ANNE ARUNDEL COUNTY, BALTIMORE CITY, BALTIMORE COUNTY, AND PRINCE GEORGE'S COUNTY AFFIRMED. COSTS TO BE PAID BY PETITIONER.**